ENGINEERED PRODUCTS
CO., Plaintiff,

v.

DONALDSON COMPANY,
INC., Defendant.

No. C 98–2106–MWB.

United States District Court,
N.D. Iowa,
Eastern Division.

Sept. 30, 2002.

Hall, pro hac vice, Christopher J. Sorenson, pro hac vice, Robins Kaplan Miller, Ciresi, Minneapolis, MN, Stephen J. Holtman, Simmons Perrine Albright Ellwood, Cedar Rapids, IA, for Donaldson Co., Inc.

Richard S. Fry, Shuttleworth & Ingersoll, Cedar Rapdis, IA, Edward M. Laine, pro hac vice, Craig J. Lervick, pro hac vice, Bridget A. Sullivan, pro hac vice, Oppenheimer Wolff & Donnelly, Minneapolis, MN, for Engineered Products Co.

Robert J. Tansey, Jr., pro hac vice, Annamarie A. Daley, pro hac vice, Ken R.

MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING DOUBLE PATENTING AND PLAINTIFF'S MOTION TO REASSERT '728 PATENT

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ...................................................1073
 A. *Procedural Background* .............................................1073
 B. *Factual Background* ...............................................1075
 1. *The air filter indicator market* ...................................1075
 2. *EPC's patents* ...............................................1076
 3. *The stipulation regarding the '728 patent* ..........................1079

II. *DONALDSON'S SUMMARY JUDGMENT MOTION REGARDING OBVIOUSNESS–TYPE DOUBLE PATENTING* ..........................1082
 A. *Timeliness of the motion* .........................................1082
 1. *Arguments of the parties* .......................................1082
 2. *Analysis* .....................................................1083
 a. *The applicable standard* ......................................1083
 b. *Application of the standards* ...................................1085
 B. *Effect Of The Stipulation And Representations On The Motion* ...........1086
 1. *Donaldson's representation concerning invalidity defenses to the '456 patent* ..............................................1086
 2. *Scope of the stipulation concerning the '728 patent* ..................1087
 C. *Standards For Summary Judgment* ................................1088
 D. *Arguments Of The Parties* ........................................1089
 E. *Obviousness–type Double Patenting* ................................1091
 1. *General principles* .............................................1091
 2. *The two-step analysis* ..........................................1093
 F. *Step One: Claim Construction* .....................................1094
 1. *Claim 1 of each patent* .........................................1094
 a. *Side–by–side comparison* .....................................1094
 b. *Identifiable differences* ......................................1096
 2. *Claims 2 and 3 of the '456 patent* ................................1097
 a. *Language of the claims* ......................................1097
 b. *Identifiable differences* ......................................1097
 i. *Construction of a means-plus-function claim* ................1098
 ii. *Construction of the means-plus-function claim here* ..........1099
 3. *Summary of step one* ..........................................1100
 G. *Step Two: Patentable Distinctions* .................................1100
 1. *The two tests* ................................................1100
 2. *Recent applications* ...........................................1101
 a. *In re Braat* .................................................1101
 b. *In re Goodman* .............................................1103
 c. *In re Emert* ................................................1103

 d. *In re Berg* ............................................1105
 e. *Eli Lilly* ............................................1107
 3. *The applicable test* ....................................1109
 a. *Could EPC have filed both sets of claims in one application?*....1109
 b. *Was the PTO solely responsible for any delay?* ..................1110
 4. *Scope of the comparison* ................................1111
 a. *Scope of comparison as framed by the parties* ...................1112
 b. *Apparent uncertainty of the case law* ............................1112
 c. *Consideration of other principles* ..............................1113
 5. *Are there patentable distinctions under the applicable test?*..........1115
 a. *The independent claims*........................................1115
 b. *The dependent claims in light of the '728 patent*.................1116
 c. *The impact of prior art*........................................1118
 i. *Arguments of the parties* ................................1118
 ii. *Authority to consider prior art* ............................1118
 iii. *Extent to which prior art should be considered* ..............1120
 d. *Merits of the "prior art" arguments* ............................1124
 i. *The prior art in question* ................................1124
 ii. *Teachings of the '457 patent* ............................1126
 iii. *Teachings of the '733 patent* ............................1129
 6. *Summary of step two* ....................................1130

III. *EPC'S MOTION TO REASSERT THE '728 PATENT* ........................1131

IV. *CONCLUSION* ....................................................1131

In this court's somewhat limited experience with patent cases, it seems that the dispute between the parties often comes down to which party is trying to pound round pegs into square holes. Of course, the dispute may be complicated further by one party's assertion that it is the pegs that are (or must be) square, while the holes are (or must be) round, inviting a rejoinder by the other party that round pegs and square holes would not be patentably distinct from square pegs and round holes, or that, even if one configuration didn't anticipate, render obvious, or literally infringe the other, it would infringe the other under the doctrine of equivalents! However, where one issue is the judge-made doctrine of "obviousness-type double patenting," as it is in this case, the Federal Circuit Court of Appeals has provided the lower courts with the following reminder: "In spite of the parties' eagerness to conform the round-peg facts of the case into semantic, square holes, the critical inquiry remains whether the claims in [a later-issued patent] define an obvious variation of the invention claimed in [an earlier-issued] patent [to the same inventor]." *See In re Emert*, 124 F.3d 1458, 1462 (Fed.Cir.1997).

Somewhat more specifically, this case involves the defendant's contention that one patent for an air filter indicator device is invalid owing to obviousness-type double patenting over another patent to the same inventor, also for an air filter indicator device, which was filed later, but issued sooner. The defendant argues that it properly raised this contention within weeks of the scheduled trial, based on a "new" decision of the Federal Circuit Court of Appeals, *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955 (Fed.Cir. 2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002), which the defendant contends "introduced a new application of the rule of obviousness-type double patenting." The plaintiff disputes the defendant's contention that the *Eli Lilly* decision requires invalidation of its later-issue patent, and also disputes whether the court should entertain the

defendant's double-patenting argument at all on the ground that it was untimely raised. In the alternative, if its later-issued patent is invalidated, the plaintiff seeks leave to reassert claims alleging infringement of its earlier-issued patent, which the plaintiff had previously stipulated could be dismissed with prejudice.

## I. INTRODUCTION

### A. Procedural Background

Former District Judge, now Circuit Judge, Michael Melloy, to whom this case was originally assigned, set the scene for the present litigation as follows: "In this patent infringement action, the plaintiff, Engineered Products Company ('EPC'), asserts patent and trade dress claims against the defendant, Donaldson Company ('Donaldson'), arising from Donaldson's creation and sale of two air filter indicator devices—the Air Alert, sold from 1997 to 1999, and the NG Air Alert, sold from 1999 through the present." *Engineered Prods. Co. v. Donaldson Co., Inc.*, 165 F.Supp.2d 836, 841 (N.D.Iowa 2001). Two of EPC's patents were originally at issue in this litigation, U.S. Patent Number 4,368,728 (the '728 patent), issued on January 25, 1983, and U.S. Patent Number 4,445,456 (the '456 patent), issued on May 1, 1984.

Landmarks in the procedural history of this case include the following events. EPC filed its Complaint in this action on November 20, 1998, and Donaldson filed its Answer and Counterclaim on January 11, 1999. EPC then filed its Reply to Donaldson's Counterclaim on February 1, 1999. Donaldson amended its Answer and Counterclaims on September 2, 1999, and EPC replied to the amended filings on October 6, 1999. Thereafter, the first truly significant occurrence in the procedural history of the case, for present purposes,

at least, occurred on July 28, 2000, when Judge Melloy set a so-called "*Markman* hearing" for September 21, 2000,[1] and established deadlines for motions for summary judgment including any requests for claim construction. Cross-motions for summary judgment from the parties on a number of issues followed, and the "*Markman* hearing," which included oral arguments on the cross-motions for summary judgment, took place as scheduled. Also, just shortly before the "*Markman* hearing," on September 13, 2000, by stipulation of the parties, Donaldson filed a Second Amended Answer and Counterclaim to which EPC replied on October 10, 2000.

On March 27, 2001, Judge Melloy rendered his opinion and order regarding the issues argued in the September 21, 2000, hearing. *See Engineered Prods. Co. v. Donaldson Co., Inc.*, 165 F.Supp.2d 836 (N.D.Iowa 2001). In that ruling, Judge Melloy denied EPC's motions for summary judgment as to various of Donaldson's equitable and invalidity defenses; granted Donaldson's motion for summary judgment on EPC's trade dress claim; granted EPC's motion for summary judgment as to Donaldson's counterclaims alleging false advertising and unfair competition; granted EPC's motion for summary judgment with regard to infringement of the '456 patent by the original Air Alert; denied EPC's motion for summary judgment with regard to infringement of the '456 patent by the NG Air Alert; and denied Donaldson's motion for summary judgment with regard to noninfringement of the '456 patent by the NG Air Alert. By order dated June 11, 2001, Judge Melloy denied Donaldson's motion to reconsider, in part, his construction of one element of the '456 patent.

---

1. The purpose of a *"Markman* hearing" is for the court to interpret the claims of a contested patent. *See Markman v. Westview Instru-* *ments, Inc.*, 52 F.3d 967 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

Of even greater interest, however, than Judge Melloy's ruling on these matters, for present purposes, was a stipulation regarding the '728 patent during the "*Markman* hearing." Pursuant to the parties' stipulation, Judge Melloy ruled that "Count I and II of EPC's Complaint, and Claim II of Donaldson's counterclaim, are dismissed, with prejudice, as are any other claims or defenses of either party to the extent they rely upon the '728 patent." *Engineered Prods. Co.*, 165 F.Supp.2d at 841 n. 1. Thus, following the parties' stipulation and Judge Melloy's ruling, only EPC's claims of infringement of the '456 patent and pertinent defenses remained at issue for trial.

By order dated April 6, 2001, Judge Melloy set this matter for jury trial on January 29, 2002, and on December 20, 2001, he denied Donaldson's motion to continue the trial. Nevertheless, this matter did not proceed to trial on January 29, 2002. Rather, on December 21, 2001, Donaldson filed the first of the motions presently pending before the court, its Motion for Summary Judgment Based on New Federal Circuit Case Law Re: Double Patenting, which diverted this matter from trial into consideration of another set of potentially dispositive motions. Donaldson's motion is potentially dispositive of this action, without the need for trial, because Donaldson contends that the decision of the federal Circuit Court of Appeals in *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002)—then almost seven months old—is "new" authority regarding obviousness-type double patenting, which, when applied to this case, requires invalidation of the only patent remaining at issue, the '456 patent, thereby mooting the only remaining claims in this action, claims of infringement of the '456 patent.

Following a status hearing on January 4, 2002, on trial readiness and trial management issues, prompted in part by Donaldson's summary judgment motion regarding double patenting, Judge Melloy orally continued the trial in this matter until further notice. By written order dated January 7, 2002, Judge Melloy memorialized his order to continue the trial and established a briefing scheduled on Donaldson's summary judgment motion regarding double patenting.

On January 23, 2002, EPC filed a resistance to Donaldson's motion, and, in partial response to that motion, filed its own Motion To Reassert The '728 Patent, which is also now pending before the court. In its motion, EPC argues that Donaldson's motion for summary judgment relies on an unforeseen argument that the '728 patent provides the basis for arguing obviousness-type double patenting as against the '456 patent. In such circumstances, EPC contends that fairness and fundamental justice should allow EPC to reassert its '728 patent, notwithstanding its prior stipulation to dismiss, with prejudice, claims regarding that patent. Thus, EPC's motion might reanimate some claims for trial—claims based on the '728 patent instead of the '456 patent—even if Donaldson's otherwise dispositive motion regarding double patenting is granted, thus eliminating claims based on the '456 patent.

Briefing on Donaldson's summary judgment motion regarding double patenting and EPC's motion to reassert the '728 patent continued through the late winter and early spring of 2002. While those matters were pending, on December 28, 2001, Donaldson sought leave of court to file a Supplement To Second Amended Answer and Counterclaims in which Donaldson asserted new affirmative defenses of "patent misuse." Such leave was grant-

ed on March 6, 2002. The Supplement did not, however, address the double-patenting defense injected into the litigation by Donaldson's motion for summary judgment.

On July 12, 2002—after this case had been reassigned to the undersigned upon the elevation of Judge Melloy to the Eighth Circuit Court of Appeals—the court entered an order on various challenges that the parties had made to each other's filings in support of or resistance to the "double patenting" and "reassertion" motions. In that order, the court, *inter alia*, permitted each party to file a surreply brief addressing arguments of the opposing party on the motion for summary judgment and the motion to reassert the '728 patent to which the briefing party believed that it had not yet had a fair opportunity to respond. In the same order, the court also set the pending motions for oral arguments on August 22, 2002.

Both EPC and Donaldson filed surreply briefs by the deadline of August 9, 2002, and the oral arguments took place as scheduled on August 22, 2002. At the oral arguments, plaintiff EPC was represented by Edward M. Laine of Oppenheimer Wolff & Donnelly, L.L.P., in Minneapolis, Minnesota. Defendant Donaldson was represented by Annamarie A. Daley and Ken R. Hall of Robins, Kaplan, Miller & Ciresi, L.L.P., in Minneapolis, Minnesota. The quality of both the briefing and oral arguments has been superb. Therefore, despite the complexity of some of the issues presented, the court finds that the parties' positions have been clearly, effectively, and zealously presented.

### B. Factual Background

Although one of the motions now pending before the court is a motion for summary judgment, and such motions ordinarily turn on the presence or absence of a genuine issue of material fact, the present factual summary does not attempt to identify all of the pertinent facts, let alone identify all of the factual disputes. Rather, it attempts to provide sufficient factual background to put in context the arguments of the parties on the pending motions.

### 1. The air filter indicator market

In his ruling on the parties' earlier cross-motions for summary judgment, Judge Melloy provided sufficient statement of the factual background to this litigation to provide a general context to the parties' claims. *See Engineered Prods. Co.,* 165 F.Supp.2d at 843–44. The court will not repeat here that entire statement of the general factual background, but some summary is nevertheless appropriate.

Suffice it to say that, in the mid–1970s, Joseph Nelson, of Waterloo, Iowa, one of the people who later incorporated EPC, invented a progressive air filter restriction indicator that allows the operator of a vehicle with a combustion engine to see how much restriction is present in the engine's air filter without having to operate the vehicle at the same time. Nelson was eventually issued both the '728 patent and the '456 patent for air filter restriction indicating devices and assigned those patents to EPC. EPC marketed a successful line of products based on these patents. In the late 1970s, Donaldson began manufacturing and selling a competing line of air restriction indicators with a lock-up feature, but its products were consistently outsold by EPC's.

The present dispute was prompted, in part, by a decision of General Motors (GM) in the mid–1990s to add a progressive air filter restriction indicator to its light truck platform, the GMT–800 platform. This platform includes large passenger vehicles, such as SUVs, and hence, was expected to see enormous growth. EPC and Donaldson, the only domestic manufacturers of

progressive air filter restriction indicators, competed for the contract to provide the required indicators. Donaldson eventually updated its product, at considerable expense, to produce the Donaldson Air Alert. Based on that upgraded design, Donaldson was awarded the GMT–800 contract. The Air Alert was manufactured and sold from 1997 to 1999, at which time it was replaced by the Next Generation Air Alert. However, on November 20, 1998, EPC filed the present action alleging that the Air Alert and NG Air Alert infringe its patents.

### 2. EPC's patents

Judge Melloy noted that Mr. Nelson was eventually issued the '456 patent for his mechanical air filter restriction indicator with a lock-up feature on May 1, 1984. The Abstract to the '456 patent describes the invention as follows:

> An air filter restriction indicating device communicating with the supply of air passing from an air filter to the air intake of an internal combustion engine. The indicating device senses a decrease in the supply of air drawn through the air filter by the engine based upon changes in the amount of vacuum in the negative side of the air supply, the amount of restriction being indicated by the movement of an indicating device. Improved means included in the indicating device senses the movement of the indicating device and progressively locks the indicating device into various indicating positions as the vacuum increases due to an increased restriction of the filter, so that the maximum reading of restriction achieved during engine operation remains visible to the operator or maintenance personnel even after the engine is turned off.

'456 patent, Abstract (Donaldson Appendix, Exhibit 3). The patent has eight claims, of which claims 1 through 3 are of greatest interest in the present posture of the litigation. Claim 1 of the '456 patent

claims the structure of the indicating device, while claim 2, a dependent "means-plus-function" claim, claims "means for guiding the indicating member as the diaphragm moves between its infold position and its outfold position," and claim 3, another dependent claim, claims a specific structure to perform the guiding function claimed in claim 2. *See id.,* col. 7. l. 56, to Col 8, l. 8.

Although it was not relevant to the matters addressed in Judge Melloy's ruling, because of the parties' stipulation regarding the '728 patent prior to that ruling, it is relevant here that Nelson had also *previously* been issued the '728 patent, which is also a patent for an air filter restriction indicating device. The parties agree that, although it was issued first, on January 25, 1983, approximately fifteen months before the '456 patent issued on May 1, 1984, the '728 patent was actually an "improvement" patent on the '456 patent. Indeed, Nelson, the inventor of both patents, described the '728 patent in the Background Of The Invention as an "improvement" over air filter restriction indicating devices of which the inventor's "co-pending application," which ripened into the '456 patent, was an example. *See* '728 patent, col. 1, lines 5–21 (Donaldson's Appendix, Exhibit 4). The Abstract to the '728 patent describes the invention as follows:

> An improved air filter restriction indicating device is disclosed for use in connection with an internal combustion engine intake air filtration system. The improvement resides in a novel structure for resetting the indicating device which permits the indicating device to be reliably used in cold, wet environments and in particularly dirty, dusty environments.

*Id.,* Abstract. The precise improvements in the '728 patent identified by the inventor were identified somewhat more extensively in the Background To The Invention

as the inclusion of "a novel reset structure that prevents the structure from being rendered ineffective due to dirt and/or ice clogging [and the ability] to be mounted in any position, including in a vertically up position as well as in a vertically down position." *See id.* at col. 1, line 44–51.

Claim 1 of the '728 patent varies but little from claim 1 of the '456 patent, as indicated in a side-by-side comparison of claim language in Donaldson's Appendix, which need not be repeated in full at this point in the present ruling. *See* Donaldson Appendix, Exhibit B. However, the '728 patent does not expressly claim any "means for guiding the indicating member" as part of the invention, as do claims 2 and 3 of the '456 patent. Rather, claims 2 through 5 of the '728 patent are dependent claims claiming the "novel reset structure" that is the claimed improvement of the '728 patent over existing air filter restriction indicating devices, such as the '456 patent. *See* '728 patent, claims 2–5.

When presented side-by-side below, Figures 3 and 4 from each patent—which show the claimed air filter indicating device in each patent in infold and outfold positions—further demonstrate the similarity of the devices at issue, meaning "similarity" only from a layman's perspective, at this point. Figure 5 from the '728 patent, also presented below, on the other hand, "is a partially cutaway, exploded view showing the components of the novel resetting structure of the ['728] invention," *see* '728 patent, Brief Description Of The Drawings, col. 2, ll. 13–15, which is included here to identify the claimed "improvement" embodied in the '728 patent over existing air filter restriction indicating devices, such as the '456 patent.

THE '456 PATENT

THE '728 PATENT

FIG. 3

FIG. 4

Fig. 3

Fig. 4

Fig. 5

While the '456 patent took almost six years to issue, the '728 patent, for which an application had been filed more than three years later, was issued in just under two years. Some of the events in the invention and prosecution of the two patents are also presented side-by-side below for comparison purposes.

THE '456 PATENT

THE '728 PATENT

06/19/78 Application Ser. No. 916,776

10/13/78 PTO rejection of all claims on prior art grounds

01/11/79 Request for extension of time

02/12/79 2nd request for extension of time, with conditional abandonment of application, and request for streamlined continuation, Application Ser. No. 011,410

07/02/79 PTO rejection of all claims on prior art grounds

09/27/79 Request for extension of time

11/01/79 Amendment cancelling pending claims and adding six claims

12/04/79 PTO allowance of amended claims and issuance of Notice of Allowance

03/18/80 Abandonment of allowed claims, request for filing of streamlined continuation, Application Ser. No. 131,456

10/02/80 Amendment adding six new claims

02/09/81 Application Ser. No. 232,422

"Co-pendency" period

02/17/81 PTO rejection of all pending claims

05/18/81 Request for extension of time

06/16/81 Request for additional extension of time, conditional abandonment of application, and third streamlined continuation application, Application Ser. No. 273,699

01/23/83 The '728 patent issued

03/31/83 PTO rejection of pending claims 1–18

06/—/83 Request for 3 month extension of time until 09/30/83

09/29/83 Amendment

11/17/83 PTO Notice of Allowance of claims 19–26

02/17/84 Base issue fee paid

05/1/84 The '456 patent issued

To summarize this history, the '456 patent took from the filing of the original application on June 19, 1978, until May 1, 1984, to issue, owing to continuations and abandonments, but the '728 patent took only from the filing of an application on February 9, 1981, until January 25, 1983, to issue, with no continuations or abandonments noted in the patent. Therefore, the later-filed '728 "improvement" patent issued first, approximately fifteen months before the '456 "basic" patent.

### 3. The stipulation regarding the '728 patent

Although EPC originally asserted claims of infringement of the '728 patent as well as the '456 patent in this litigation, the '728 patent dropped out of this litigation as the result of a stipulation during the "*Mark-*

*man* hearing." Because EPC now seeks to reintroduce claims of infringement of the '728 patent, it is well to review the parties' stipulation and Judge Melloy's resulting order regarding claims and defenses involving the '728 patent.

In the pertinent portion of the *"Markman* hearing," the court and the parties first discussed a stipulation that Donaldson's original Air Alert, which was marketed in 1997, is an infringing device, and that, if none of Donaldson's other defenses to the validity of the '456 patent is valid, Donaldson would owe EPC damages for such infringement, although there was no stipulation as to the measure of any such damages. *See* Transcript, Markman Hearing and Hearing on Summary Judgment Motions, 96–97. The court and the parties then turned to discussion of the stipulation regarding the '728 patent, which is of interest here. That discussion consisted of the following:

MS. DALEY [ (Counsel for Donaldson) ]: And there's another stipulation that might make sense to put on the record with regard to the Next Generation device. Mr. Laine has agreed on behalf of EPC—correct me if I'm wrong, Mr. Laine—that they no longer are asserting the '728 patent against the Next Generation Donaldson indicator and that they won't sue us during the remaining months of the life of that patent.

THE COURT: And I think there was something to that effect in one of the briefs.

MR. LAINE [ (Counsel for EPC) ]: It's in the briefs too, Your Honor.

THE COURT: Is that the stipulation, Mr. Laine?

MR. LAINE: That is we are relying exclusively on the '456 patent on proving infringement with the second or Next Generation.

THE COURT: And as I understand it—we will be getting into this in a little more detail in just a little bit, but Donaldson has this prior art defense to the '728 patent, but as I understand it, they've never raised a prior art defense to the '456 patent; is that right?

MS. DALEY: We have a different invalidity defense.

THE COURT: Your invalidity defense to the '456 patent is, in essence, it was marketed more than a year prior to the patent date?

MS. DALEY: Exactly, Your Honor.

THE COURT: But the '728 prior art defense is premised on '456's invalidity and that's the prior art to the '728; is that right?

MS. DALEY: The '728 patent invalidity, Your Honor, is not premised on invalidity of the '456 patent.

THE COURT: But I thought the report—if I read it correctly—said that some of the prior arts of the '456 patent—

MS. DALEY: Right. And so the '456 patent—the fact is that the Filter Minder was out in the marketplace for sale more than one year before the filing date of the '728 patent.

THE COURT: But it's the same facts; right? I mean basically if the '456 patent is valid, then you don't have a prior art defense to the '728 patent; right?

MS. DALEY: No, that's not correct, Your Honor. Even if the '456 patent is valid, we would still have an invalidity argument on the '728 patent.

THE COURT: Well—

MS. DALEY: And Mr. Hall is going to make that argument. Maybe he can explain it to you.

THE COURT: Well, I guess if they're not suing on the '728 patent, do we have to get into the invalidity of the '728?

MS. DALEY: But they still have the '728 seeking damages on the original indicator, Your Honor; on—under the '728 patent.

THE COURT: Well, what difference—I guess now I'm—I guess now I'm confused. What difference does that make which of your two patents it infringes if they're willing to stipulate they're infringing the '456?

MR. LAINE: It really has no material consequences in terms of the remedy that we can recover unless Donaldson is going to try and later argue that they're the prevailing party; that they somehow are defeating the '728 patent, but since we're not relying on it for the second generation device and since it's stipulated that the '456 is infringement first [sic (infringed by the first device?)], it really has no practical consequence anymore and probably can dispense of it [sic].

THE COURT: What is the practical consequences [sic] of the validity or invalidity of the '728?

MS. DALEY: Only if they're seeking damages against us, Your Honor. And again, we already have the stipulation on the record with respect to future sales. So if Mr. Laine is willing to stipulate to a dismissal of the '728 patent infringement claim against the original indicator, it's no longer an issue.

MR. LAINE: I wish I could drop it, Judge.

THE COURT: And you're stipulating that this did infringe the '456?

MS. DALEY: The original indicator, subject to our defenses, yes, Your Honor.

THE COURT: All right. You are not going to sue as to the '728; is that right, Mr. Laine?

MR. LAINE: We're not going to sue as to the '728 as [to (?)] the second device. We really don't need to as to

the first and we would be content to rely on the '456 and withdraw that claim with the understanding that Donaldson would then withdraw its validity defenses that relate to that so that the whole thing is just gone for both sides and in an equal fashion.

THE COURT: Is that agreeable?

MS. DALEY: I think that's the most sufficient [sic] use of everyone's resources.

THE COURT: All right. Then let's move on to talk—well, I guess it seems to me probably the next thing to talk about is the validity of the '456.

MS. DALEY: And I understand then what EPC has done is it's stipulated to a dismissal with prejudice of the '728 patent in this lawsuit?

MR. LAINE: Yes.

THE COURT: With the understanding that any attack in affirmative defense or counterclaim or otherwise that relates to its validity is withdrawn as well.

MS. DALEY: Yes, Your Honor.

THE COURT: All right. So that will be so ordered then.

Transcript, Markman Hearing and Hearing on Summary Judgment Motions, at 98–102.

In his ruling following the "*Markman* hearing," Judge Melloy described the parties' stipulation regarding the '728 patent, and the effect of that stipulation, as follows:

This action originally involved allegations by EPC that Donaldson's products infringed two EPC patents: U.S. Patent No. 4,368,728 ("the '728 patent"), issued on January 25, 1983, and U.S. Patent No. 4,445,456 ("the '456 patent"), issued on May 1, 1984. At oral argument, both parties agreed to withdrawal with prejudice of any claims or defenses based on

the '728 patent. Accordingly, Count I and II of EPC's Complaint, and Claim II of Donaldson's counterclaim, are dismissed, with prejudice, as are any other claims or defenses of either party to the extent they rely upon the '728 patent. *Engineered Prods. Co.*, 165 F.Supp.2d at 841 n. 1. However, the parties now dispute—among many other things—the accuracy of Judge Melloy's characterization of their stipulation regarding the '728 patent, the effect of the stipulation on their claims and defenses, and whether the stipulation and portion of Judge Melloy's order pursuant to that stipulation should now be set aside upon EPC's motion to reassert the '728 patent.

As noted above, there are two motions pending before the court: Donaldson's December 21, 2001, Motion for Summary Judgment Based on New Federal Circuit Case Law Re: Double Patenting, and EPC's January 23, 2002, Motion To Reassert The '728 Patent, which was filed as a partial response to Donaldson's motion regarding double patenting. Although EPC's motion is not expressly contingent upon the granting of Donaldson's motion, it is offered "in partial response" to Donaldson's motion. Thus, the court deems it appropriate to begin its legal analysis with Donaldson's motion for summary judgment, then consider EPC's motion to reassert the '728 patent only to the extent that it may be necessary to do so in light of its disposition of Donaldson's summary judgment motion.

## II. DONALDSON'S SUMMARY JUDGMENT MOTION REGARDING OBVIOUSNESS–TYPE DOUBLE PATENTING

### A. Timeliness of the motion

Before considering the merits of Donaldson's summary judgment motion regarding double patenting, the court must first take up the procedural issue of the timeliness of

that motion. This is so, because the motion was filed on the eve of trial, and because EPC has asserted that the untimeliness of the summary judgment motion is a sufficient, independent ground for denying it, without regard to the merits.

### 1. Arguments of the parties

In its opening brief in support of its summary judgment motion regarding double patenting, Donaldson contends that the court should entertain the motion, even though it was filed just over a month before this case was scheduled to go to trial, and well after the dispositive motion deadline embodied in Judge Melloy's order setting a *"Markman* hearing" and deadlines for summary judgment motions, because Donaldson's latest summary judgment motion seeks to invalidate the lone patent still at issue, the '456 patent, based on "new" Federal Circuit case law. Donaldson identifies that "new" authority as the decision of the Federal Circuit Court of Appeals in *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002).

However, in its resistance to Donaldson's motion, EPC argues that the motion was filed on the eve of trial, without any prior hint that double patenting was at issue in this case. EPC argues, further, that Donaldson did not plead any affirmative defense of obviousness-type double patenting and had never identified that ground for invalidity of the '456 patent in answer to any interrogatories regarding its claims or defenses. Thus, EPC argues that Donaldson waived any defense premised on double patenting. Moreover, EPC argues that the decision in *Eli Lilly* was handed down *several months before* Donaldson ever asserted the purported dispositive impact of that decision on this case, and that the *Eli Lilly* decision neither

stated a new rule nor overruled prior precedent on double patenting. In these circumstances, EPC argues that the *Eli Lilly* decision provides little excuse for the untimely assertion of arguments based on double patenting. "In short," EPC summarizes, "if the concept of untimeliness can ever prevent the last minute assertion of claims or defenses, that concept is properly applied here." EPC's Brief Resisting Donaldson's Motion for Summary Judgment on Double Patenting at 18.

In reply, Donaldson argues that it never waived a double-patenting defense, because it alleged, generally, that the '456 patent is invalid, it reserved the right to assert additional grounds for invalidity in its Second Amended Answer and Counterclaims, and it included a reference to the '728 patent as a basis for invalidating the '456 patent in its timely Notice pursuant to 35 U.S.C. § 282. Furthermore, Donaldson contends that, during a case management conference, it promptly notified the court of the *Eli Lilly* decision "as soon as Donaldson became aware of this new case law," and that it then filed its summary judgment motion based on the *Eli Lilly* decision just two days after the conference. Finally, Donaldson asserts that it will be prejudiced if it is not permitted to present invalidating prior art, particularly when the issue is supported only by new case law.

In its surreply brief, which the undersigned specifically authorized to address arguments to which a party believed that it had not yet had a fair opportunity to respond, EPC contends that Donaldson's argument that it could not have asserted a double-patenting argument before the *Eli Lilly* decision was handed down is "disingenuous." This is so, EPC contends, because Donaldson in fact relies on older cases to assert that the applicable test of double patenting, under the circumstances presented here, is the one-way test later applied in *Eli Lilly*, demonstrating that the *Eli Lilly* decision presents nothing "new."

### 2. Analysis

#### a. The applicable standard

■ Notwithstanding—and not finding persuasive—Donaldson's assertions that its existing pleadings and answers to interrogatories were sufficient to put EPC on notice of the possibility of a double-patenting defense to the '456 patent, the court concludes that the appropriate standard against which to judge the timeliness or untimeliness of Donaldson's motion for summary judgment regarding double patenting is the standard applicable to belated amendments to assert a new defense. This is so, because whatever the manner in which double patenting has been asserted in this litigation, the effect of Donaldson's motion is to inject—for the first time or by way of an unforeseen clarification—an invalidity defense heretofore not contemplated or addressed by the parties.

Rule 15 of the Federal Rules of Civil Procedure provides that, except in circumstances not presented here, amendments of pleadings are permitted as follows:

> [A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

FED. R. CIV. P. 15(a).[2] In *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court stated,

> In the absence of any apparent or declared reason—such as undue delay, bad

---

**2.** Even though the parties have now extensively briefed the issue of Donaldson's double-patenting defense, the court does not believe that the circumstances presented here involve an amendment to conform to proof within the meaning of Rule 15(b).

faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should as the rules require, be "freely given."

*Foman,* 371 U.S. at 182, 83 S.Ct. 227. Not only is the language of Rule 15(a) and precedent of the Supreme Court and the Federal Circuit Court of Appeals pertinent to the issue of belated assertion of a defense, but the Federal Circuit Court of Appeals has explained that amendment of pleadings is " 'a subject which is not unique to patent law, [so that] we look to the law of the regional circuit.' " *Datascope Corp. v. SMEC, Inc.,* 962 F.2d 1043, 1045 (Fed.Cir.1992) (quoting *Kalman v. Berlyn Corp.,* 914 F.2d 1473, 1480 (Fed. Cir.1990)). Thus, this court may also properly consider Eighth Circuit standards for amendment of pleadings under Rule 15(a).

Expounding upon the language of Rule 15(a) and the interpretation of that Rule by the Supreme Court in *Foman,* the Eighth Circuit Court of Appeals has explained, " 'Only limited circumstances justify a district court's refusal to grant leave to amend pleadings: Undue delay, bad faith on the part of the moving party, futility of the amendment or unfair prejudice to the opposing party.' " *Costello, Porter, Hill, Heisterkamp & Bushnell v. Providers Fidelity Life Ins. Co.,* 958 F.2d 836, 839 (8th Cir.1992) (quoting *Sanders v. Clemco Indus.,* 823 F.2d 214, 216 (8th Cir. 1987), in turn citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). More recently, the Eighth Circuit Court of Appeals affirmed denial of leave to amend on grounds of prejudice to the non-movant and undue delay in seeking to amend, finding that the district court had appropriately considered the following factors: "(1) almost a year had passed since

the deadline for amending claims when [the movant] sought leave to amend; (2) extensive discovery had been conducted and had closed; and (3) dispositive motions had been filed and were pending before the court." *Deutsche Financial Services Corp. v. BCS Ins. Co.,* 299 F.3d 692, 700 (8th Cir.2002).

The Federal Circuit Court of Appeals also has not been silent on the effect of "undue delay" on leave to amend pleadings:

Notwithstanding the view that Fed. R.Civ.P. 15(a) is to be construed liberally, courts have not hesitated to deny motions to amend that have been filed after significant delay. *Delay alone, even without a demonstration of prejudice, has thus been sufficient grounds to deny amendment of pleadings. In some cases it has been held important in determining the propriety of the motion for leave to amend whether prejudice would result to the nonmoving party. Senza–Gel Corp. v. Seiffhart,* 803 F.2d 661, 666, 673 (Fed.Cir.1986) (citations omitted) (Bennett, J., dissenting). According to Wright and Miller, "[T]he risk of substantial prejudice increases with the passage of time." 6 Wright & Miller & Kane, Federal Practice and Procedure § 1488 at 439 (1971). The Fifth Circuit stated in *Chitimacha [Tribe of Louisiana v. Harry L. Laws Co.,* 690 F.2d 1157, 1163 (5th Cir.), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983) ], "[m]ere passage of time need not result in a denial of leave to amend, but delay becomes fatal at some period of time" (citing *Gregory v. Mitchell,* 634 F.2d 199, 203 (5th Cir. 1981)) (in light of significant delay—27 months from filing of original complaint—and the fact that the tribe failed to cure deficiencies in earlier amendments, denial of the tribe's motion to amend was not an abuse of discretion); *see Woodson v. Fulton,* 614 F.2d 940,

943 (4th Cir.1980) (leave to amend "may be denied for undue delay").

\* \* \* \* \* \*

... Thus, with the passage of time and acceptance of multiple earlier amendments, a point is reached when the party seeking to amend must justify that request by more than invocation of the concept of the rule's liberality.

*Te–Moak Bands of Western Shoshone Indians of Nevada v. U.S.*, 948 F.2d 1258, 1262–63 (Fed.Cir.1991) (emphasis added) (non-patent case). Thus, the court in *Te–Moak Bands* focused on the undue delay, standing alone, and the effect of undue delay in terms of risk of prejudice to the *non-movant*.

On the other hand, in a prior decision, *Cornwall v. U.S. Construction Manufacturing, Inc.*, 800 F.2d 250 (Fed.Cir.1986)— a patent case upon which both parties here rely, although they extract from it diametrically opposed principles—the Federal Circuit Court of Appeals also recognized that a court must consider the risk of prejudice to the *movant* of denial of leave to amend. Relying on Eleventh Circuit precedent, the court in *Cornwall* reversed a district court's denial of leave to amend the defendant's answer to assert patent invalidity. *See Cornwall*, 800 F.2d at 252– 53. After emphasizing "the importance of considering what effect the denial of a motion to amend would have on the movant," noting that the district court had failed to offer "any justifying reason" for denying leave to amend, and finding that it appeared that the movant would be prejudiced by denial of leave to amend its answer to assert a defense of patent invalidity, the appellate court reversed the district court's denial of leave to amend. *See Cornwall*, 800 F.2d at 253.

### b. Application of the standards

Here, the court finds little justification for Donaldson's failure to assert double

patenting as a ground for invalidity of the '456 patent well before it did so, *even if* the *Eli Lilly* decision first made Donaldson aware of the availability of a double-patenting defense to the '456 patent. *See Foman*, 371 U.S. at 182, 83 S.Ct. 227 (considering the movant's "undue delay" as a ground for denying leave to amend); *Costello*, 958 F.2d at 839 (same); *Te–Moak Bands*, 948 F.2d at 1262–63 (same). This is so, because the issue of double-patenting was not newly minted by the *Eli Lilly* decision; Donaldson only asserted that issue long after the dispositive motion deadline set by Judge Melloy, and well after the parties had completed extensive discovery; Donaldson had twice previously amended its answer and counterclaims without asserting the double-patenting issue; and, as noted above, the *Eli Lilly* decision was handed down on May 30, 2001, almost seven months *before* Donaldson filed its motion relying upon that decision on December 21, 2001. *Cf. Deutsche Fin. Servs. Corp.*, 299 F.3d at 700 (considering the following factors: (1) considerable time had passed since the deadline for amending claims before the movant sought leave to amend; (2) extensive discovery had been conducted and had closed; and (3) dispositive motions had been filed and were pending before the court). Thus, there is some smack of gamesmanship in the timing of Donaldson's motion several months after the decision upon which it relies was handed down, but only a little over a month before trial was set to begin.

■ However, the dispositive issue here is a balance of prejudice to the parties that would arise from either considering or refusing to consider the double-patenting issue. *Compare, e.g., Te–Moak Bands*, 948 F.2d at 1262–63 (considering prejudice to the non-movant), *with Cornwall*, 800 F.2d at 253 (considering prejudice to the mov-

ant). On the one side of the scales, the possible prejudice to Donaldson from refusing to hear its defense of patent invalidity, however belatedly that defense was asserted, is substantial. *Cf. Cornwall*, 800 F.2d at 253 (concluding that it "appear[ed]" that the movant was prejudiced by denial of leave to assert a patent invalidity defense). On the other side of the scales, any prejudice to EPC from the belated assertion of the double-patenting defense has been largely cured: EPC was not required to address the defense upon short notice at trial, because Judge Melloy continued the trial, and EPC has had the opportunity to present a full resistance to Donaldson's motion for summary judgment. Under the circumstances presented here, where the patents at issue have already expired, thus fixing the limits on the period during which any infringement and damages must be determined, the delay of the trial itself cannot be considered "prejudice" to EPC.

Therefore, while not condoning such belated assertion of a defense—and particularly a patent invalidity defense—that could reasonably have been asserted sooner, the court will consider Donaldson's motion as the only means of curing potential prejudice to Donaldson arising from inability to assert a defense of patent invalidity, while imposing no significant prejudice upon EPC. Couched in terms of the standards stated in Rule 15(a), the court concludes that "justice . . . requires" consideration of Donaldson's belated summary judgment motion asserting the defense of double patenting.[3]

### B. Effect Of The Stipulation And Representations On The Motion

 Another procedural impediment to consideration of Donaldson's motion for summary judgment must also be considered before the court can turn to the merits of that motion. Although EPC does not expressly argue that Donaldson's summary judgment motion regarding double patenting is contrary to the parties' stipulation to dismiss claims and defenses relating to the '728 patent, EPC does argues, *inter alia*, that Donaldson has "reversed field" on a representation, made in connection with the stipulation during the "*Markman* hearing," that Donaldson's *only* invalidity defense to the '456 patent was that the invention was marketed more than a year prior to the patent application. Donaldson argues that this so-called representation referred only to the invalidity defenses to the '456 patent then before the court on summary judgment, not to any and all invalidity defenses that Donaldson had ever asserted or could ever assert. The court deems it appropriate to consider, at least briefly, whether Donaldson's motion for summary judgment on double patenting is barred either by the parties' stipulation regarding the '728 patent or by Donaldson's "representation" about its invalidity defenses to the '456 patent.

### 1. Donaldson's representation concerning invalidity defenses to the '456 patent

First, the "representation" regarding invalidity defenses to the '456 patent upon

---

**3.** EPC also argues that the decision in *Eli Lilly* does not announce any new rule regarding the proper test for double patenting or expressly overrule any prior precedent regarding double patenting, such that the supposed "novelty" of the decision did not create any new basis for asserting double patenting that did not already exist long before Donaldson filed its belated summary judgment motion. This argument is pertinent to whether or not the court should entertain an untimely motion for summary judgment, but, under the circumstances, the court concludes that the better course is to entertain the summary judgment motion, and address there, on the merits, the impact of the *Eli Lilly* decision upon this litigation.

which EPC relies arises from the following exchange:

> THE COURT: And as I understand it—we will be getting into this in a little more detail in just a little bit, but Donaldson has this prior art defense to the '728 patent, but as I understand it, they've never raised a prior art defense to the '456 patent; is that right?
>
> MS. DALEY [ (for Donaldson) ]: We have a different invalidity defense.
>
> THE COURT: Your invalidity defense to the '456 patent is, in essence, it was marketed more than a year prior to the patent date?
>
> MS. DALEY: Exactly, Your Honor.

Transcript, Markman Hearing and Hearing on Summary Judgment Motions, p. 98, *ll.* 10–22. The court finds that the representation by Donaldson's counsel unambiguously referred only to invalidity defenses *then at issue.* Although the representation could, perhaps, be construed as an abandonment of any of the other invalidity defenses that Donaldson had *already pleaded* or had *identified in response to EPC's interrogatories*—a matter the court need not decide at this point—it cannot be read as foreclosing Donaldson from asserting an invalidity defense it had *not previously asserted.* The court resolved, above, the question of whether Donaldson should now be permitted to inject such a new defense into this litigation, under a Rule 15(a) standard, concluding that Donaldson could do so.

### 2. Scope of the stipulation concerning the '728 patent

Nor does the stipulation concerning the '728 patent itself bar Donaldson from asserting an invalidity defense to the '456 patent *based on* the '728 patent, such as a defense of obviousness-type double patenting. This court recognizes that Judge Melloy's summary or characterization of the stipulation in his ruling on the parties' cross-motions for summary judgment might suggest such a bar, because his characterization was as follows:

> At oral argument, both parties agreed to withdrawal with prejudice of any claims *or defenses based on the '728 patent.* Accordingly, Count I and II of EPC's Complaint, and Claim II of Donaldson's counterclaim, are dismissed, with prejudice, as are any other claims *or defenses* of either party *to the extent they rely upon the '728 patent.*

*Engineered Prods. Co.,* 165 F.Supp.2d at 841 n. 1 (emphasis added). However, the stipulation that was actually entered on the record was not quite so broad, or, to put it another way, Judge Melloy's characterization must be read in light of the actual stipulation on the record.

The transcript of the stipulation, which is quoted more fully *supra,* in Section I.B.3., indicates that the parties recognized that the *claims* as to which the stipulation regarding the '728 patent applied were EPC's claims *of infringement* of that patent by Donaldson's devices, which were asserted in Counts I and II of EPC's Complaint, and Donaldson's *defenses* asserting *the invalidity of the '728 patent.* Near the end of the discussion of the parties stipulation regarding the '728 patent, the following exchange occurred:

> THE COURT: All right. You are not going to sue as to the '728; is that right, Mr. Laine?
>
> MR. LAINE [ (for EPC) ]: We're not going to sue *as to the '728 as [to (?) ] the second device.* We really don't need to *as to the first* and we would be content to rely on the '456 *and withdraw that claim* with the understanding that Donaldson would then withdraw its validity defenses *that relate to that* so that the whole thing is just gone for both sides and in an equal fashion.
>
> THE COURT: Is that agreeable?

MS. DALEY: I think that's the most sufficient [sic] use of everyone's resources.

Transcript, Markman Hearing and Hearing on Summary Judgment Motions, at p. 101, *ll.* 7–19. EPC's counsel's references to its patents in relation to Donaldson's "first" and "second" devices, in the context presented immediately above and upon consideration of the fuller context of the entire discussion of the stipulation, plainly were references to EPC's claims of *infringement* of the '728 patent by those devices, while his reference to "validity defenses that relate to that" plainly refers to validity defenses to the '728 patent. Before the court moved on to other matters in the *"Markman* hearing," counsel for Donaldson sought some clarification of the stipulation, as follows:

MS. DALEY: And I understand then what EPC has done is it's stipulated to a *dismissal with prejudice of the '728 patent in this lawsuit?*

MR. LAINE: Yes.

THE COURT: With the understanding that any attack in affirmative defense or counterclaim or otherwise *that relates to its validity* is withdrawn as well.

MS. DALEY: Yes, Your Honor.

THE COURT: All right. So that will be so ordered then.

Transcript, Markman Hearing and Hearing on Summary Judgment Motions, at p. 101, *l.* 24, to p. 102. *l.* 9 (emphasis added). While Donaldson's counsel's question is overbroad, in the sense that it does not specify *claims of infringement of* the '728 patent, but instead refers to "dismissal with prejudice of the '728 patent in this lawsuit," the question sought clarification of *what claims involving the '728 patent EPC had agreed to dismiss.* Again, the only claims involving the '728 patent that EPC had asserted were claims that Donaldson's devices infringed that patent as

well as the '456 patent. Thus, no ambiguity arises from Donaldson's counsel's question. On the other hand, the court's characterization of the tradeoff clearly demonstrates that the *affirmative defenses and counterclaims that Donaldson was stipulating would be dismissed* related to the "invalidity" *of the '728 patent,* not the '456 patent.

The court concludes that neither the parties' stipulation nor the representation by Donaldson's counsel during the *"Markman* hearing" stands as a bar to Donaldson's present assertion of a motion for summary judgment on the ground that the '456 patent is invalid owing to obviousness-type double patenting in light of the '728 patent. Therefore, the court may turn to consideration of the merits of that summary judgment motion.

### C. Standards For Summary Judgment

Analysis of the merits of Donaldson's motion begins with the standards applicable to a motion for summary judgment. Rule 56 of the Federal Rules of Civil Procedure, which governs motions for summary judgment, states, in pertinent part, the following:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(b)-(c) (emphasis added). Thus, as the plain language of the rule indicates, the appropriateness of summary

judgment ordinarily turns on whether or not there are genuine issues of material fact that must be resolved by the trier of fact. "A genuine issue exists if the evidence is such that a reasonable jury could find for the nonmoving party." *Eli Lilly*, 251 F.3d at 962 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "A disputed fact is material if it might affect the outcome of the suit such that a finding of that fact is necessary and relevant to the proceedings." *Id.* (again citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). "While the burden rests on the party moving for summary judgment to show 'that there is an absence of evidence to support the nonmoving party's case,' the nonmoving party must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact-exists for trial." *Id.* at 971 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

On the other hand, questions of law are particularly amenable to summary judgment precisely because they do not turn on factual disputes. *See, e.g., Varilease Technology Group, Inc. v. U.S.*, 289 F.3d 795, 798 (Fed.Cir.2002) (contract interpretation, as a question of law, is amenable to summary judgment); *Gentex Corp. v. Donnelly Corp.*, 69 F.3d 527, 530 (Fed.Cir.1995) (patent claim interpretation, as a question of law, is amenable to summary judgment). Double patenting, which is at issue in Donaldson's motion for summary judgment, is a question of law for the court, *see, e.g., Georgia–Pacific Corp. v. United States Gypsum Co.*, 195 F.3d 1322, 1326 (Fed.Cir. 1999), *as amended on denial of rehearing and rehearing en banc*, 204 F.3d 1359 (Fed.Cir. Feb.23, 2000), *cert. denied*, 531 U.S. 816, 121 S.Ct. 54, 148 L.Ed.2d 22 (2000), as is the determination of whether a "one-way" or "two-way" test of double patenting is appropriate. *See In re Emert*, 124 F.3d 1458, 1460 (Fed.Cir.1997). Nevertheless, the legal question of which test of double patenting applies may depend upon specific findings of fact. *See id.* Therefore, this aspect, at least, of Donaldson's motion for summary judgment regarding double patenting may be subject to genuine issues of material fact, notwithstanding that the ultimate questions of what test applies and whether there was double patenting are questions of law. Moreover, other legal determinations in the double-patenting analysis may also be subject to genuine issues of material fact. *Cf. Eli Lilly*, 251 F.3d at 971–72 (noting that there were no genuine issues of material fact as to whether fluoxetine hydrochloride inhibits the uptake of serotonin in animals, or that human is a species of the animal genus, such that the double-patenting issue in that case was "solely a matter of law").

### D. Arguments Of The Parties

In support of its motion for summary judgment, Donaldson contends that, in *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002), the Federal Circuit Court of Appeals "introduced a new application of the rule of obviousness-type double patenting." Specifically, Donaldson contends that, in *Eli Lilly*, the court held that if a later-filed, but earlier-issued patent anticipates or renders obvious an earlier-filed, but later-issued patent, and the same party holds the rights to both patents, the earlier-filed patent is invalid. Donaldson contends that, before the *Eli Lilly* decision, the rule was, " 'When a basic patent is filed

before but issued after an improvement patent, the order of issuance is disregarded and the later-issuing patent is upheld if the improvement patent is not obvious in light of the basic patent.'" Donaldson's Brief in Support of Motion for Summary Judgment Based on New Federal Circuit Case Law Re: Double Patenting at 6 (quoting 3 D. CHISUM, PATENTS, § 9.03[2][c] (2000)). Donaldson contends, "With its decision in *Eli Lilly & Co. v. Barr Laboratories, Inc.,* 251 F.3d 955 (Fed.Cir.2001), [*cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002),] however, the Federal Circuit no longer disregards the order of issuance. Instead ..., the current law now requires that the claim(s) of an earlier-filed but later-issued patent be held invalid if it is anticipated by, or is obvious in light of, the claim(s) of a commonly-owned earlier-issued patent." *Id.* In this case, Donaldson argues that the earlier-issued '728 patent anticipates the later-issued '456 patent, adding only an improved reset structure, and the '456 patent is not "patentably distinct" from the '728 patent, rendering the '456 patent invalid under the rule of obviousness-type double patenting, as articulated in *Eli Lilly.*

In response, EPC argues that, under the "one-way test" applied in *Eli Lilly,* claims 2 and 3 of the '456 patent are "patentably distinct" from the claims of the '728 patent, because those claims claim a "guiding means" that is neither claimed in the '728 patent, nor obvious over the claims of the '728 patent. Moreover, EPC argues that, in the circumstances presented here, the "two-way test," not the "one-way test" should apply, allowing it to demonstrate that the earlier-issued '728 patent is *also* patentably distinct from the later-issued '456 patent, because claim 1 of the '728 patent claims a novel reset structure that is not claimed in claim 1 of the '456 patent. EPC contends that the *Eli Lilly* decision did not sweep away the two-way test, but instead held that it was

inapplicable in the circumstances presented in that case. EPC contends, however, that the two-way test is applicable here, because the inventions were made at different times, and accordingly, different application dates with different specifications for the '456 patent and the '728 patent were necessary and proper, and EPC did not control or "orchestrate" the progress of the two patents through the PTO, or delay prosecution of the '456 patent. Still more specifically, EPC contends that, during the "critical" period of "co-pendency" of the applications for the two patents, the PTO, not EPC, delayed the application for the '456 patent by not responding to a continuation for over 21 months.

In its reply brief, Donaldson argues that *Eli Lilly,* as well as earlier precedent, establish that the two-way test is only available in circumstances presenting a narrow exception to application of the one-way test: that is, pursuant to *Eli Lilly,* the two-way test is only applicable if the PTO is *solely* responsible for the delay in prosecution of the earlier-filed, but later-issued patent. Here, however, Donaldson argues that EPC cannot avail itself of the narrow exception, because it was responsible for numerous continuations and abandonments of the application that ultimately led to issuance of the '456 patent; had EPC not abandoned allowed claims in 1980, the '456 patent would have issued before the application for the '728 patent was even filed; and EPC was responsible for delays, in the form of continuations and requests for extensions of time to respond to office actions, even during the "co-pendency" of the applications for the two patents. Returning to its principal theme that the '456 patent is invalid for obviousness-type double patenting under the one-way test that Donaldson contends is applicable, Donaldson argues that the subject matter of claim 2 of the '456 patent, the "guiding means," is also claimed in claim 1

of the '728 patent, which claims a "cylindrical rod," because that "cylindrical rod" is equivalent to the "tubular member" performing the guiding function in claim 2 of the '456 patent. Next, Donaldson argues that claims 2 and 3 of the '456 patent are obvious over claim 1 of the '728 patent *in light of the prior art,* including two patents to Richard Nelson, the brother of the inventor of the '456 patent and the '728 patent, which disclose a "guiding means" in the same configuration found in the '456 patent. In the alternative, Donaldson argues that, even if the two-way test is applicable, the '728 patent is not patentably distinct from the '456 patent, because the claims of the '728 patent would also have been obvious in light of the prior art, including the Donaldson Service Indicator, which enclosed the internal workings of the indicator from cold, wet, dust, and dirt.

In the first of the surreply briefs authorized by the court, EPC argues that the inventions claimed in claims 2 and 3 of the '456 patent are neither claimed in nor obvious over any of the claims of the '728 patent. EPC argues that the structure corresponding to the "guiding means" in the means-plus-function claim in claim 2 of the '456 patent is not the "tubular member" identified by Donaldson, but a central depending cylindrical boss, which has within it a central bore that guides the tubular member. EPC also contends that Donaldson's reliance upon prior art is meritless, because the so-called prior art upon which Donaldson relies had different performance requirements and different structures, and there was no motivation to join the elements of the prior art with other elements in the way taught by the '456 patent, so that only hindsight could suggest the combination of any guiding means in the Richard Nelson patents with the other elements of the '456 patent. EPC also relies on objective evidence of non-obviousness, including the failure of Donaldson to use a "guiding means" in its

indicators before the infringing Air Alert, and the success of EPC's own indicators including such a "guiding means." EPC also reiterates and amplifies its contention that the proper test, under the circumstances, is the two-way test, and that, under that test, the '456 patent is valid. EPC argues that there was no possibility that the inventions at issue in the two patents could have been prosecuted in one application, because they were invented at different times, and EPC did not delay prosecution of the '456 patent during the period of "co-pendency." As to application of the two-way test, EPC argues that, even *if it is proper to consider "prior art,"* Donaldson has grossly oversimplified the applicability of supposed "prior art," which is in a different field and for which there was no motivation toward combination with other elements to create the invention embodied in the '456 patent.

It its own surreply brief, Donaldson argues that EPC's arguments under the one-way test rely on a faulty assumption that claim 2 of the '456 patent does not claim a guiding means in the form of the cylindrical rod disclosed in claim 1 of the '728 patent, and the equally strained argument that the guiding means is not the tubular guiding member, but the boss and bore. Moreover, Donaldson reiterates that the elements of the '456 patent that EPC argues are "patentably distinct" from the '728 patent are obvious in light of prior art, when that prior art is properly analyzed.

### E. Obviousness-type Double Patenting

#### 1. General principles

In the *Eli Lilly* decision upon which Donaldson primarily relies, the Federal Circuit Court of Appeals summarized the principles of "obviousness-type double patenting" as follows:

Through a statutorily prescribed term, Congress limits the duration of a

**1092**

patentee's right to exclude others from practicing a claimed invention. 35 U.S.C. § 154(a)(2) (1994). The judicially-created doctrine of obviousness-type double patenting cements that legislative limitation by prohibiting a party from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent. *In re Longi,* 759 F.2d 887, 892, 225 USPQ 645, 648 (Fed.Cir.1985) (explaining that, even though no explicit statutory basis exists for obviousness-type double patenting, the doctrine is necessary to prevent a patent term extension through claims in a second patent that are not patentably distinct from those in the first patent). As one of our predecessor courts explained, "[t]he fundamental reason for the rule [of obviousness-type double patenting] is to prevent unjustified timewise extension of the right to exclude granted by a patent no matter how the extension is brought about." *In re Van Ornum,* 686 F.2d 937, 943–44, 214 USPQ 761, 766 (Cust & Pat.App.1982) (quoting *In re Schneller,* 55 C.C.P.A. 1375, 397 F.2d 350, 158 USPQ 210, 214 (Cust & Pat.App.1968)). *Eli Lilly,* 251 F.3d at 967–68 (footnote omitted). This summary initially requires only slight amplification, although it is well to identify some additional principles of obviousness-type double patenting.

In *In re Lonardo,* 119 F.3d 960 (Fed.Cir.1997), *cert. denied,* 522 U.S. 1147, 118 S.Ct. 1164, 140 L.Ed.2d 175 (1998), the Federal Circuit Court of Appeals distinguished between "same invention" double patenting, which is not at issue here, and "obviousness-type" double patenting, which is at issue here, as follows:

"Same invention" double patenting is based upon 35 U.S.C. § 101 (1994), which states that an inventor may obtain "a patent" for an invention. The statute thus permits only one patent to be obtained for a single invention, and the phrase "same invention" refers to an invention drawn to substantially identical subject matter. [*In re Longi,* 759 F.2d 887, 892 (Fed.Cir.1985) ]. Obviousness-type double patenting, on the other hand, is judicially created and prohibits an inventor from obtaining a second patent for claims that are not patentably distinct from the claims of the first patent. *Id.*

*In re Lonardo,* 119 F.3d at 965. Perhaps more importantly under the circumstances presented here, as noted above, obviousness-type double patenting is a question of law for the court, *see Georgia–Pacific Corp.,* 195 F.3d at 1326; *In re Berg,* 140 F.3d 1428, 1432 (Fed.Cir.1998); *In re Emert,* 124 F.3d 1458, 1460 (Fed.Cir.1997); *In re Goodman,* 11 F.3d 1046, 1052 (Fed. Cir.1993), making the issue amenable to summary judgment. Indeed, as the Federal Circuit Court of Appeals explained in a decision handed down prior to *Eli Lilly,* "*De novo* review [on appeal] is appropriate because double patenting is a matter of what is claimed, and therefore is treated like claim construction upon appellate review." *Georgia–Pacific Corp.,* 195 F.3d at 1326.

As to the scope of the doctrine, "[u]nder obviousness-type double patenting, a patent is invalid when it is *merely an obvious variation* of an invention disclosed *and claimed* in an earlier patent *by the same inventor.*" *Id.* (emphasis added); *see also In re Berg,* 140 F.3d at 1431–32 (describing double patenting as "requir[ing] rejection of an application claim when the claimed subject matter is not patentably distinct from the subject matter *claimed* in *a commonly owned patent,*" and "[i]ts purpose is to prevent an unjustified extension of the term of the right to exclude granted by a patent by allowing a

second patent claiming an *obvious variant* of the same invention to issue to *the same owner later* ") (emphasis added). Thus, "the critical inquiry remains whether the claims in [a later-issued patent] define *an obvious variation* of the invention claimed in [an earlier-issued] patent" to the same inventor. *See In re Emert,* 124 F.3d at 1462.

■ To put it another way,

A patentable distinction does not lie where a later *claim* is *anticipated by* an earlier one. That is, a later patent *claim* that fails to provide novel invention over an earlier *claim* is not patentably distinct from the earlier *claim.*

*Eli Lilly & Co.,* 251 F.3d at 970 (emphasis added). Furthermore, "[a] reference is anticipatory if it discloses every limitation of the claimed invention *either explicitly or inherently,*" and "[a] reference includes an inherent characteristic if that characteristic is the 'natural result' flowing from the reference's explicitly explicated limitations." *Id.*

■ Thus, whether cast in terms of "obviousness" or "anticipation" of one patent in light of the other, obviousness-type double patenting requires, *inter alia,* the same inventor or common ownership for the earlier and later patents, and a comparison of what is *claimed* in each patent, including what is claimed, either explicitly or inherently, in the earlier patent.

#### 2. The two-step analysis

■ The court in *Eli Lilly* also explained the two-step analysis courts must undertake of obviousness-type double patenting, as follows:

Generally, an obviousness-type double patenting analysis entails two steps. First, as a matter of law, a court construes the claim in the earlier patent and the claim in the later patent and determines the differences. *Georgia–Pacific Corp. v. United States Gypsum*

*Co.,* 195 F.3d 1322, 1326, 52 USPQ2d 1590, 1593 (Fed.Cir.1999). Second, the court determines whether the differences in subject matter between the two claims render the claims patentably distinct. *Id.* at 1327, 195 F.3d 1322, 52 USPQ2d at 1595. A later claim that is not patentably distinct from an earlier claim in a commonly owned patent is invalid for obvious[ness]-type double patenting. *In re Berg,* 140 F.3d 1428, 1431, 46 USPQ2d 1226, 1229 (Fed.Cir. 1998). A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim. *In re Longi,* 759 F.2d at 896, 225 USPQ at 651 (affirming a holding of obviousness-type double patenting because the claims at issue were obvious over claims in four prior art patents); *In re Berg,* 140 F.3d at 1437, 46 USPQ2d at 1233 (Fed.Cir.1998) (affirming a holding of obviousness-type double patenting where a patent application claim to a genus is anticipated by a patent claim to a species within that genus).

*Eli Lilly,* 251 F.3d at 968 (footnote omitted).

This two-step analysis certainly was not newly introduced by the *Eli Lilly* decision. Some time earlier, the Federal Circuit Court of Appeals had also explained the double-patenting inquiry as follows:

The double patenting determination involves two inquiries. First, is the same invention claimed twice? *General Foods Corp. v. Studiengesellschaft Kohle mbH,* 972 F.2d 1272, 1278, 23 USPQ2d 1839, 1843 (Fed.Cir.1992). This inquiry hinges upon the scope of the claims in question. *Id.* at 1280; *In re Vogel,* 57 C.C.P.A. 920, 422 F.2d 438, 441, 164 USPQ 619, 621–22 (Cust. & Pat.App. 1970). If the claimed inventions are identical in scope, the proper rejection is

under 35 U.S.C. § 101 because an inventor is entitled to a single patent for an invention. *Miller v. Eagle Mfg. Co.,* 151 U.S. 186, 197, 14 S.Ct. 310, 314, 38 L.Ed. 121 (1894); *In re Stanley,* 41 C.C.P.A. 956, 214 F.2d 151, 153, 102 USPQ 234, 236 (Cust. & Pat.App.1954).

\* \* \* \* \* \*

If one claimed invention has a broader scope than the other, the court must proceed to a second inquiry: whether one claim defines merely an obvious variation of the other patent claim. *Vogel,* 422 F.2d at 441. Without a patentable distinction—because the pending claim defines merely an obvious variation of the patented claim—the patentee may overcome the double patenting rejection by filing a terminal disclaimer. *See In re Eckel,* 55 C.C.P.A. 1068, 393 F.2d 848, 157 USPQ 415 (Cust. & Pat.App.1968). *In re Goodman,* 11 F.3d at 1052; *see also Georgia–Pacific Corp.,* 195 F.3d at 1326 ("[A]nalysis of the claims at issue is the first step in determining if the second invention is merely an obvious variation of the first."); *In re Emert,* 124 F.3d at 1461–62 (although the court appeared to focus first on which test applied at the second step of the analysis, the court also examined carefully "the characterization of the relation between the two claims," and any differences between them); *but see In re Berg,* 140 F.3d at 1432 (performing the first step in the analysis only implicitly, and focusing instead on the question of what test applied to the determination of whether the claims of the two patents were "patentably distinct").

### F. Step One: Claim Construction

As explained above, as the first step in the analysis of obviousness-type double patenting, "as a matter of law, a court construes the claim in the earlier patent and the claim in the later patent and determines the differences." *Eli Lilly,* 251 F.3d at 968; *Georgia–Pacific Corp.,* 195

F.3d at 1326; *In re Emert,* 124 F.3d at 1461–62; *In re Goodman,* 11 F.3d at 1052. In *Eli Lilly,* the court cast the first step in the analysis in terms of whether "[a] person of ordinary skill in the art would have recognized" that the patents claimed essentially the same thing. *Eli Lilly,* 251 F.3d at 969. However, especially where claims in the two patents are very similar, the analysis also requires consideration of any differences between the claims of the two patents. *See id.* (identifying the "only difference" between the claims of the two patents to be that one addressed a method of treating anxiety in humans with fluoxetine hydrochloride, while the other claimed a method of using fluoxetine hydrochloride to block serotonin uptake in animals, and elsewhere describing the two claims as having a "genus" and "species" relationship); *Georgia–Pacific Corp.,* 195 F.3d at 1326–27 (because the "two claims [we]re very similar," indeed, nearly "identical," based on a comparison of language of the claims, the court was required to "look to see if there [wa]s anything to distinguish" the two claims). Similarly, in *In re Goodman,* the court analyzed the relationship between the two claims, finding that one was a narrower "species" of the other, broader "genus" claim. *In re Goodman,* 11 F.3d at 1052.

### 1. Claim 1 of each patent

#### a. Side-by-side comparison

To facilitate the necessary comparison here, the court presents below a side-by-side comparison of the language of claim 1 of the '456 patent and claim 1 of the '728 patent, much as shown in Dondaldson's Appendix, Exhibit B. However, unlike Donaldson's side-by-side comparison, the court presents below apparent additions to the language of claim 1 of the '728 patent, as compared to claim 1 of the '456 patent, in italics, and apparent deletions by strike-

outs—recognizing that the '728 patent was an "improvement" patent on the invention in the '456 patent, notwithstanding that it actually issued first. In the claims of both patents, the court also shows rearrangements of comparable language with underlining and the use of different terms in analogous limitations with bold font.

| THE '456 PATENT: CLAIM 1 | THE '728 PATENT: CLAIM 1 |
| --- | --- |
| What is claimed is: | I claim: |
| 1. An improved restriction indicating device for an air filter used with an internal combustion engine where the improved indicating device is in communication with the air flowing from the air filter to the air intake of the internal combustion engine, the improved indicating device **comprising:** | 1. In an improved *air filter* restriction indicating device for an air filter used with an internal combustion engine where*in* the improved indicating device is in communication with the air flowing from the air filter to the air intake of the internal combustion engine *and wherein* the improved indicating device **includes:** |
| a *housing having a first end, a second end, and a side* wall that includes a transparent portion; the first end, the second end and the side wall defining an overall chamber in the housing; | a *housing having a first end, a second end, and a side* wall that includes a transparent portion, *with* the first **and** second ends and the side wall defining *a cylindrical,* overall chamber in the housing *and with the second end having an opening therein;* |
| a flexible diaphragm disposed within the housing, with the diaphragm having a central portion and having an edge portion secured to the housing so that the diaphragm divides the overall chamber into a first chamber, adjacent to the first end of the housing, and a second chamber, adjacent to the second end of the housing; the central portion of the diaphragm being movable between an infold position wherein it is more closely adjacent to the second end of the housing and an outfold position wherein it is more closely adjacent to the first end of the housing; | a flexible diaphragm *member* disposed within the housing, with the diaphragm *member* having a central portion and having an edge portion secured to the housing so that the diaphragm divides the overall chamber into a first chamber, adjacent to the first end of the housing, and a second chamber, adjacent to the second end of the housing, *and with* the central portion of the diaphragm *member* being movable between an infold position wherein it is more closely adjacent to the second end of the housing and an outfold position wherein it is more closely adjacent to the first end of the housing; |
| an indicating member that is disposed within the first chamber in the housing and that is carried by and **movable with** the diaphragm; the indicating member being visible through the transparent portion of the side wall of the housing at least as the diaphragm moves between its infold position and its outfold position; | an indicating member that is disposed within the first chamber in the housing and that is **mounted on and** carried by the diaphragm *member,* the indicating member being visible through the transparent portion of the side wall of the housing at least as the diaphragm *member* moves between its infold position and its outfold position; |
| means for permitting communication between the first chamber in the housing and the air flowing from the air filter to the air intake of the internal combustion engine; | means for permitting communication between the air flowing from the air filter to the air intake of the internal combustion engine and the first chamber in the housing; |
| means, including an opening in the second end of the housing, for permitting communication between the atmosphere and the second chamber in the housing; | means, including an opening in the second end of the housing, for permitting communication between the atmosphere and the second chamber in the housing; |
| a coil compression spring disposed in the first chamber of the housing, **the compression spring being biased between the first end of the housing and the indicating member,** with the bias of the compression spring being sufficient **to move** the diaphragm to its infold position when the vacuum in the first chamber is relatively low, **as when a new air filter is initially used, but permitting** the diaphragm **to move** from its infold position toward its outfold position in response to increases in the vacuum in the first chamber; | a coil compression spring disposed in the first chamber of the housing, **with one end of the compression spring being in contact with the first end of the housing and the other end of the compression spring being in contact with the indicating member, with the compression spring having a compression force sufficient to balance the differential between atmospheric pressure in the second chamber of the housing and the vacuum being drawn in the first chamber by the air flowing from the air filter to the air intake of the internal combustion engine so that the indicating member will deform the** diaphragm *member* into its infold position when the vacuum in the first chamber is relatively low **and so** that the diaphragm *member, and the indicating member,* **will be moved** from its infold position toward its outfold position in response to increases in the vacuum in the first chamber; |
| lock-up means for progressively locking the indicating member in the various positions which it attains within the first chamber as the diaphragm moves from its infold position to its outfold position and for maintaining the indicating member in its last such position | *and* lock-up means for progressively locking the indicating member in the various positions which **the indicating member** attains within the first chamber as the diaphragm *member* moves from its infold position to its outfold position and for maintaining the indicating |

even though there may thereafter be a subsequent decrease in the vacuum in the first chamber, the lock-up means including a tubular member carried by and movable with the central portion of the diaphragm with the tubular member having a closed end that is adjacent to the first end of the housing and having an open end that is adjacent to the second end of the housing and that is in open communication with the second chamber; the lock-up means also including an elongated locking member having a first end and a second end, the locking member being supported by the second end of the housing so as to permit movement of the first end of the locking member between a first position and a second position; the first end of the locking member being disposed, when the first end of the locking member is in its first position, adjacent to the open end of the tubular member; the second end of the locking member projecting from the second chamber through the opening in the second end of the housing; the first end of the locking member and the open end of the tubular member having interengagable notches thereon that are adapted to be engaged when the first end of the locking member is in its first position, with engagement between the notches permitting the diaphragm to move from its infold position to its outfold position but preventing the diaphragm from returning to its infold position; and

member in its last such position even though the diaphragm member may thereafter return towards its infold position due to a subsequent decrease in the vacuum in the first chamber, the lock-up means including a centrally disposed cylindrical rod which is mounted on and carried by the central portion of the diaphragm *member,* which is in part disposed in the first chamber, and which projects from the diaphragm member toward the first end of the housing, with the cylindrical rod having a recess defined by a closed end, projecting towards the first end of the housing, an internal side wall, and an open end that is in communication with the second chamber; the lock-up means also including an elongated locking member having a first end and a second end, *with* the locking member being supported, *for pivotal movement intermediate its ends,* by the *first portion of* the second end of the housing, so that the second end of the locking member may be selectively, pivotally moved in the recess in the cylindrical rod through a predetermined arc, and with the second end of the locking member normally being disposed adjacent to the open end of the cylindrical rod and cooperating with the open end of the cylindrical rod so that the indicating member is progressively locked and maintained in position by engagement between the second end of the locking member and the cylindrical rod, the improvement comprising:

means for selectively disengaging the interengagable notches so as to permit the diaphragm to return to its infold position when the vacuum in the first chamber is relatively low.

means for selectively *pivoting the first end of the locking member through the predetermined arc and thus causing the second end of the locking means to pivot through the predetermined arc, in the recess in the cylindrical rod, the pivoting means including means carried by the first end of the locking member; a relatively flexible resetting cover which has an external surface and an internal surface, which is mounted on a second portion of the second end of the housing spaced from the first portion of the second end of the housing in a direction parallel to the path of movement of the indicating member, and which is disposed adjacent to the carried means and in a plane substantially perpendicular to the path of movement of the indicating member; the resetting cover being deformable toward the first portion of the second end of the housing when a person or object pushed against its external surface, so that the internal surface of the resetting disc will contact the carried means when the resetting cover is deformed and will thereby cause the first end of the locking member to be pivoted through the predetermined arc.*

### b. Identifiable differences

Although the first claims of the two patents are "very similar," the side-by-side comparison above demonstrates that they are not simply "identical." *See Georgia–Pacific Corp.,* 195 F.3d at 1326. Just as clearly, some of the differences are inconsequential, such as the difference between "the improved indicating device **comprising**" in claim 1 of the '456 patent and "the

improved indicating device **includes**" in claim 1 of the '728 patent. As the Manual of Patent Examining Procedure explains, "comprising" is "synonymous with" "including," so that both are "inclusive or open-ended and d[o] not exclude additional, unrecited elements or method steps." MANUAL OF PATENT EXAMINING PROCEDURE § 2111.03 (8th ed.2001). Indeed, EPC has argued that there is only one difference between claim 1 of the '456 patent and

claim 1 of the '728 patent that is significant: EPC points out that the last limitation of claim 1 of the '728 patent claims a novel reset structure, which prevents the structure from being rendered ineffective owing to clogging by dirt or ice, but that no such limitation is claimed anywhere in claim 1 of the '456 patent. The court agrees that, ultimately, the only significant difference between the first claims of the two patents may be that claim 1 of the '728 patent claims an additional, specific structure, the "novel reset structure."

Also, in light of this relationship between the independent claims of the two patents, the '728 patent is an "improvement" patent, in the sense that the word "improvement" implies "that [the '728 patent] was developed specifically for use with the 'basic' invention"—that is, air filter restriction indicating devices of which the inventor's "co-pending application," which ripened into the '456 patent, was an example, *see* '728 patent, col. 1, lines 5–21 (Donaldson's Appendix, Exhibit 4)—and does, in the present circumstances, suggest that the '728 patent "must have come later in time" than air filter restriction indicating devices *of the type* represented by the '456 patent. *Cf. In re Braat,* 937 F.2d 589, 593 (Fed.Cir.1991) ("improvement" implies development specifically for use with the "basic" invention and that the improvement came later in time). Indeed, the inventor specifically averred that the '728 patent had come later than the '456 patent. Thus, claim 1 of the '728 patent is *not* "totally separate" from claim 1 of the '456 patent, in that the "improvement" of the '728 patent was intended to work with air filter restriction indicating devices of the type represented by the '456 patent. *See id.; see also In re Berg,* 140 F.3d at 1434 (also considering whether the two inventions were "totally separate," as in *In re Braat* ).

### 2. Claims 2 and 3 of the '456 patent

On the other hand, EPC argues that claims 2 and 3 of the '456 patent introduce other differences between the scope of the '456 patent and the '728 patent by claiming a "guiding means" that is not claimed anywhere in the '728 patent. Thus, the court must also consider and construe these claims of the '456 patent.

### a. Language of the claims

Claims 2 and 3 of the '456 patent add the following dependent claims to the invention in that patent:

2. The improved restriction indicating device described in claim 1 which includes means for guiding the indicating member as the diaphragm moves between its infold position and its outfold position.

3. The improved restriction indicating device described in claim 2 wherein the guiding means includes a centrally disposed tubular hub portion mounted on the first end of the housing and projecting into the first chamber toward the second end of the housing; and wherein the closed end of the tubular member projects into the first chamber and protrudes into and is closely slidable within the tubular hub portion as the diaphragm moves between its infold position and its outfold position.

The '456 patent, claims 2 & 3.

### b. Identifiable differences

The court must agree with EPC that there is no limitation in any of the claims of the '728 patent that expressly claims any kind of "guiding means." Nevertheless, Donaldson contends that claim 1 of the '728 patent claims a "guiding means," at least inherently or implicitly, because it claims a "cylindrical rod" that correlates to the "tubular member," which Donaldson contends performs the guiding function in

claims 2 and 3 of the '456 patent. In light of this argument, further construction of claims 2 and 3 of the '456 patent and claim 1 of the '728 patent must be undertaken.

*i. Construction of a means-plus-function claim.* The parties agree that claim 2 of the '456 patent is a "means-plus-function" claim, and consequently, "[c]onstruction of such a limitation requires the court to first identify the function of the means-plus-function limitation and next identify the corresponding structure in the written description necessary to perform that function." *See, e.g., BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, L.L.C.,* 303 F.3d 1332, —— (Fed.Cir.2002) (citing *Micro Chem., Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1258 (Fed.Cir. 1999)). However, Donaldson contends that the *only* structure in the written description performing the "guiding" function is the "tubular member," and contends, further, that this structure is also claimed, at least implicitly, in the "cylindrical rod" of claim 1 of the '728 patent. Donaldson also argues that such an identification of a single structure as performing this function is consistent with Judge Melloy's conclusion that only the "button" performed the function of "selectively disengaging the interengagable notches" in claim 1 of the '456 patent. The court does not agree with any of these contentions.

In *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,* 296 F.3d 1106 (Fed.Cir. 2002), the Federal Circuit Court of Appeals explained the circumstances in which more than one mechanical element may perform a recited function, as follows:

> First, although it is indeed true as a general proposition that multiple structures *can* perform a single claimed function, this is so only where the claim language permits, and only where the specification clearly identifies corresponding structures. Thus, in *In re Knowlton,* this court's predecessor reversed an indefiniteness rejection that appeared to be predicated on the misconception that each means-plus-function limitation "can *only* be read on a single mechanical element of the invention which performs the recited function without aid from other elements of the invention." 481 F.2d 1357, 1368, 178 USPQ 486, 494 (Cust. & Pat.App.1973) (emphasis in original). Instead, the court concluded that "the application describes and identifies apparatus combinations which perform each of the functions *called for by the means-plus-function recitations of the claims,* and further describes how those combinations are made, and that therefore the claims are adequately supported by the specification." *Id.* (emphasis added). In light of the emphasized language, we understand *Knowlton* to stand not for the proposition that multiple structures *may* always perform a single function claimed in a means-plus function limitation, but rather that multiple structures may correspond to a single claimed function in certain instances, *where the claim language permits.* .*See also Ishida [Co., Ltd. v. Taylor],* 221 F.3d [1310,] 1317, 55 USPQ2d at 1454 [ (Fed.Cir. 2000) ] (construing the claims to cover separate structures for performing "stripping" and "sealing" functions in means-plus-function limitation reciting "[a] *pair* of *opposing* sealing and stripping means ... being adapted to *cooperate ....*") (emphasis added).

*Cardiac Pacemakers, Inc.,* 296 F.3d at 1117–18 (emphasis in the original). The court later added,

> It remains true, of course, that corresponding structure need not include all things necessary to enable the claimed invention to work. It is equally true, however, that corresponding structure must include all structure that actually performs the recited function. *See As-*

*yst [Techs., Inc. v. Empak, Inc.]*, 268 F.3d [1364,] 1371, 60 USPQ2d at 1571–72 [ (Fed.Cir.2001) ]. In *Asyst*, this court emphasized that the determination of what structure corresponds to a claim function is contingent upon the language of the claims. *Id.* at 1372, 268 F.3d 1364, 60 USPQ2d at 1573.

*Id.* at 1119. Thus, whether or not only a single mechanical structure—such as a "button" or a "tubular member" or "cylindrical rod"—can perform the specified function depends upon the *language of the claim*, not on some *per se* rule. Judge Melloy's construction of "button" as the means required to perform the function of selectively disengaging the interengagable notches relied on precisely the issue of what structure was necessary to perform fully the specified function, in light of the claim language. *See Engineered Prods. Co.*, 165 F.Supp.2d at 879–880.

**ii. Construction of the means-plus-function claim here.** As to the means-plus-function claim now at issue, it is self-evident that, as to the first step in the construction of the claim, the "function" performed by the "guiding means" limitation, *see BBA Nonwovens Simpsonville, Inc.*, 303 F.3d at 1343 ("Construction of [a means-plus-function] limitation requires the court to first identify the function of the means-plus-function limitation."), is "guiding the indicating member as the diaphragm moves between its infold position and its outfold position." *See* the '456 patent, claim 2. As to the second step in the construction of the claim, the court finds that the pertinent part of the written description of the '456 patent identifying the corresponding structure that performs this "guiding" function, *see BBA Nonwovens Simpsonville, Inc.*, 303 F.3d at 1343 ("[N]ext [the court must] identify the corresponding structure in the written description necessary to perform that function."), is the following:

Said end wall 28 has a central depending cylindrical boss 72. A central bore 74 is in the boss 72.

The bottom wall 64 of the member 62 includes an upstanding tubular guiding member 76 having a closed upper end portion and an open lower end portion 78 extending through and being secured to the underlying central bottom wall 56 of the diagram [sic: diaphragm?] 54. The upper end portion of the member 76 is slidably disposed in the bore 74 so as to guide the vertical movement of the member 62. Said guiding member 76 is of such a length as not to be fully withdrawn from within. said bore when said diaphragm is folded in upon itself, that is, when the diaphragm is in its infold position as indicated in FIG. 3.

The '456 patent, Description of the Preferred Embodiment, col. 4, *ll.* 33–47. Figure 3 of the '456 patent, to which the description refers, appears herein at page 12, and may clarify the precise structures at issue. The court finds that claim 3 of the '456 patent, which claims a specific structure to perform the "guiding" function, is also consistent with this description. *See* the '456 patent, claim 3, col. 7, *l.* 60, col. 8, *l.* 8; *see also supra*, Section II.F.2.b. (quoting claim 3 in its entirety).

What is apparent from the language of claim 2, this description, as well as from the specific structure claimed in claim 3, is that the "guiding" function is *not* performed *solely* by the "tubular guiding member 76," but also by the "bore 74"—more specifically described in claim 3 as a "tubular hub portion"—through which the "tubular guiding member" is "slidably disposed ... *so as to guide the vertical movement of the member 62.*" *Id.* (emphasis added). The language of the claim, which states, "means for guiding the indicating member as the diaphragm moves between its infold position and its outfold position,"

plainly suggests the interaction of two or more mechanical components, the interaction of which guides the indicating member, or holds it in a required alignment, as the diaphragm moves between its infold and outfold positions. *See* the '456 patent, claim 2. Again, "what structure corresponds to a claim function is contingent upon the language of the claims." *Cardiac Pacemakers, Inc.*, 296 F.3d at 1119 (citing *Asyst*, 268 F.3d at 1372). This is, in the court's mind, a classic example of circumstances in which "multiple structures ... correspond to a single claimed function," because "the claim language permits." *Id.* at 1118. Therefore, even though claim 1 of the '728 patent claims a "cylindrical rod," and even if this structure is analogous to the "tubular member" that is one of the mechanical elements performing the "guiding" function in claim 2 of the '456 patent, nowhere in claim 1 of the '728 patent is there any claim of any structure as performing a "guiding" function, nor is there any reference in that claim to any structure analogous to the "bore" or "tubular hub" through which the "cylindrical rod" is "slidably disposed" so as to guide the movement of the indicating member as the diaphragm moves. Rather, the functions of the "cylindrical rod" in claim 1 of the '728 patent are specified to be housing the "pivoting means" of the "locking member" and "cooperating" with the "locking member" to "progressively lock" and "maintain" the indicator in place. *See* the '728 patent, claim 1 (above). Thus, as a matter of claim construction, claim 1 of the '728 patent neither explicitly nor inherently claims the guiding means claimed in claims 2 and 3 of the '456 patent.

### 3. *Summary of step one*

By way of summary, claims 1, 2, and 3 of the '456 patent combine a progressive air filter restriction indicating device, as claimed in claim 1, with a "guiding means" as claimed in claims 2 (means-plus-func-

tion) and 3 (specific structure), while claim 1 of the '728 patent combines a progressive air filter restriction indicating device with a "novel reset structure." Thus, the claims of the '456 patent might be described as claiming $a + b$, where $a$ is the progressive air filter restriction indicating device claimed in independent claim 1 and $b$ is the guiding means claimed in dependent claims 2 and 3. On the other hand, claim 1 of the '728 patent might be described as claiming $a + c$ in a single independent claim, where $a$ is, again, the progressive air filter restriction indicating device, but $c$ is the "novel reset structure." However, neither patent involves a combination of both of these subcombinations, that is $a + b + c$. Compare *In re Braat*, 937 F.2d at 593 (each patent involved combination/subcombinations, and one of the patents included additional claims combining the two subcombinations).

### G. *Step Two: Patentable Distinctions*

"Having recognized the difference between the claims at issue, [the court] must decide whether this difference renders the claims patentably distinct." *Eli Lilly*, 251 F.3d at 969; *In re Goodman*, 11 F.3d at 1052 (because the claimed inventions were not identical in scope, the court was required to determine, at the second step of the analysis, whether the differences defined only an "obvious variation" or a "patentable distinction"). One of the disputed issues in this case is what test should be used to determine, at this second step in the double-patenting analysis, whether differences between the patents at issue make them "patentably distinct."

### 1. *The two tests*

The Federal Circuit Court of Appeals "has set forth two tests for obviousness-type double patenting rejections" at the second step in the analysis. *In re Emert*,

124 F.3d at 1461. As that court has explained,

> Under [a one-way] test, the examiner [or court] asks whether the application claims [or claims of the later-issued patent] are obvious over the patent claims [or claims of the earlier-issued patent]. . . . Under the two-way test, the examiner [or court] also asks whether the [earlier-issued] patent claims are obvious over the application [or later-issued patent] claims. Thus, when the two-way test applies, some claims may be allowed that would have been rejected under the one-way test.

*In re Berg,* 140 F.3d at 1432 (citations omitted); *In re Emert,* 124 F.3d at 1461 (identifying the same two tests). The choice of the applicable test may be particularly significant here, because EPC argues that claims 2 and 3 of the '456 patent render that patent patentably distinct from claim 1 (or any other claims) of the '728 patent under either a one-way or a two-way test, but EPC's only assertion that the first, independent claims of the two patents are patentably distinct from each other is under a *two-way* test, where claim 1 of the '456 patent claims nothing that distinguishes it sufficiently from claim 1 of the '728 patent, but claim 1 of the '728 claims a "novel reset structure", not found in claim 1 of the '456 patent. Unfortunately, even though "[t]he question of whether the 'one-way' test or the 'two-way' test applies ... is one of law," *id.,* this court finds that precedent of the Federal Circuit Court of Appeals concerning which test applies in what circumstances is, at best, confusing. The court will attempt to resolve the confusion, to the best of its ability, by surveying recent decisions of the Federal Circuit Court of Appeals.

### 2. Recent applications

#### a. In re Braat

Because much of the recent confusion about which test applies seems to center on the import of the decision of the Federal Circuit Court of Appeals in *In re Braat,* 937 F.2d 589 (Fed.Cir.1991), that decision will be this court's point of departure as it attempts to determine whether the one-way or the two-way test applies in the circumstances presented here. *In re Braat* involved denial of a patent application, "the Braat application," which claimed priority from an application filed April 3, 1978, for "an optical record carrier"—"[o]ne commonly-known example of [which] is a compact disc, or CD"—on the basis of obviousness-type double patenting over another patent, the Dil patent, for "a record carrier having angled side walls," filed later, on January 31, 1979, but issued earlier, on June 24, 1980. Both the Braat application and the Dil patent had been assigned to U.S. Phillips Corporation. *In re Braat,* 937 F.2d at 590 & 592. The court "note[d] at the outset the difficulty which arises in all obviousness-type double patenting cases of determining when a claim is or is not an obvious variation of another *claim." Id.* at 592 (emphasis in the original). Consequently, in that case, as here, "[t]he crux of th[e] [case] comes down to whether the Board erred in applying a 'one-way' patentability determination instead of a 'two-way' determination." *Id.* at 593.

The court concluded, first, that the Board had "correctly found that the rejected claims of Braat are merely obvious variations of the invention described by dependent claims 5/1 and 6/1 of Dil"—that is, that the Braat application would fail on obviousness-type double patenting grounds under a one-way test. *Id.* The only difference between the claims, the court found, was the *omission* from the claims in the Braat application of the requirement in the claims of the Dil patent of "information areas having side walls which are angled at a particular angle." *Id.* The court concluded that the *omission* of such a limitation

would not constitute an "unobvious modification." *Id.* However, "[t]he issue [wa]s whether the Board erred in concluding that such a one-way determination was all that was necessary or whether it was necessary to also determine whether the claims of Dil [we]re patentably distinct from the invention described by the rejected claims of Braat; i.e., whether the *addition* in the claims of Dil of side walls which are angled at a particular angle was merely an obvious modification over the invention claimed in Braat." *Id.* (emphasis in the original). In short, the critical question was whether the *two-way* test applied.

Phillips, the common assignee of the Braat application and the Dil patent, argued in *In re Braat,* that the proper rule was that "when a later filed improvement patent issues before an earlier filed basic invention, a double patenting rejection is only proper against the claims to the basic invention if the improvement is not patentably distinct from the basic invention," *i.e.,* a two-way test, for which Phillips relied on 3 D. CHISUM, PATENTS, § 9.03[2][c] (1990). *Id.* The court noted, that the rationale for such a rule was that "an applicant (or applicants) who files applications for basic and improvement patents should not be penalized by the rate of progress of the applications through the PTO, a matter over which the applicant does not have complete control," and noted further that, "[i]n this situation, the order of issuance is, in effect, ignored, and the relevant determination becomes whether the improvement is patentably distinct from the generic invention," again relying on Chisum as the authority for both observations. *Id.*[4]

The court in *In re Braat* took issue with the contention that the Dil invention was an "improvement" over Braat, but never-

theless held that the "two-way test" applied under the circumstances presented:

> [W]e agree that the reasoning of [*In re Borah,* 53 C.C.P.A. 800, 354 F.2d 1009 (1966) ] and Chisum, § 9.03[2][c] is applicable in the present case. *Philips could not have included the claims of Dil in the Braat application, for Braat did not invent the subject matter of the Dil claims,* i.e., information areas having V-shaped side walls at particular angles of inclination. *Nor could Philips have included the claims of Braat in the Dil application, for Dil did not invent the subject matter of the Braat application,* i.e., adjacent track segments of different phase depth. *Philips filed the Braat and Dil applications so as to maintain proper inventorship,* with claims directed to Braat's "subcombination" invention in the first application and claims directed to both Dil's "subcombination" invention and to the "combination" invention in the second application. Philips even acknowledged in Dil's application that part of the combination invention was invented by Braat, not Dil. *It is not Philips' fault that the combination claims in the Dil patent issued first.* Thus, a double patenting rejection is sustainable here only if claims 5/1 and 6/1 of Dil are not patentably distinct from the subject matter defined by the rejected claims of Braat, and the Board erred in sustaining the double patenting rejection without making such a "two-way" determination.

*In re Braat,* 937 F.2d at 593–94 (emphasis added). Thus, in *In re Braat,* the court held that a two-way test applied where the assignee of both the application and the patent could not bring both sets of claims

---

4. Thus, in *In re Braat,* Phillips asserted that the applicable rule was the same rule that Donaldson argues here was the prevailing rule prior to the *Eli Lilly* decision, and both

Phillips and Donaldson drew that rule from the Chisum treatise, albeit relying on different editions. *See supra,* Section II.D.

in a single application without violating existing law on inventorship, and it was not the assignee's "fault" that the later-filed "combination" patent issued before the earlier-filed application.

### b. In re Goodman

Subsequently, in *In re Goodman*, 11 F.3d 1046 (Fed.Cir.1993), the court stated the second step in the analysis of obviousness-type double patenting in terms of a "one-way test," considering whether "the pending claim defines merely an obvious variation of the patented claim." *In re Goodman*, 11 F.3d at 1053. However, as to the "two-way test," the court explained,

> In *In re Braat*, 937 F.2d 589, 593 (Fed.Cir.1991), this court required *in certain circumstances*, an additional inquiry to support the double patenting obviousness rejection. Under these circumstances, a double patenting obviousness rejection will only be sustained if the application claims are not patentably distinct from the prior patent claims, and the prior patent claims are also not patentably distinct from the application claims. This "two-way" analysis is necessary because a later-filed improvement patent may issue before an earlier-filed basic invention. *Id.; see Stanley*, 41 C.C.P.A. 956, 214 F.2d 151.

*In re Goodman*, 11 F.3d at 1053 (emphasis added). Thus, in *In re Goodman*, the court suggested that the two-way test used in *In re Braat* applied only "in certain circumstances." Thus, contrary to Donaldson's contentions, at least as early as the decision in *In re Goodman*, the one-way test was regarded as the norm, and the two-way test was viewed as applicable only "in certain circumstances"; this view of the general rule was not suddenly established by the much later decision in *Eli Lilly*.

The court in *In re Goodman* then identified the "certain circumstances" that had warranted application of a two-way test in

*In re Braat* as including the fact that "Braat's application was held up not by the applicant, but by 'the rate of progress of the application through the PTO, over which the applicant does not have complete control.'" *Id.* at 1053 (quoting *In re Braat*, 937 F.2d at 593). However, in *In re Goodman*, the court held that "[t]his case requires no 'two-way' analysis," because "PTO actions did not dictate the rate of prosecution"; the applicant "chose to file a continuation [of broader claims] and seek early issuance of the narrow species claims," which did in fact issue as the patent against which the application was compared for double-patenting purposes; the applicant "also chose to forego an immediate appeal to [the Federal Circuit Court of Appeals] on its broader claims when it filed a continuation application"; and, finally, the applicant continued to argue that a terminal disclaimer, which might otherwise have cured the double-patenting problem as to his pending application, was "unwarranted." *Id.* Under a one-way test, the court concluded that the claims of the earlier-filed, but not-yet-issued application were "generic" to the "species" claims of the earlier-issued patent to the same inventor, and as such, "the generic invention is 'anticipated' by the species of the patented invention." *Id.* Therefore, the court held that the application was properly rejected for obviousness-type double patenting. *Id.*

What is interesting here is that the court in *In re Goodman* not only described the two-way test as applying only in "certain circumstances," but identified a number of circumstances that justified rejecting application of the two-way test *besides* responsibility for delay in prosecution of the later-issued patent.

### c. In re Emert

Still later decisions continued to "marginalize" application of the two-way test, so

that application of that test could not possibly have been considered "the rule" prior to *Eli Lilly*. In *In re Emert*, 124 F.3d 1458 (Fed.Cir.1997), the court chose to apply the one-way test after the following compact comparison of the decisions in *In re Braat* and *In re Goodman:*

> This court has set forth two tests for obviousness-type double patenting rejections. In *In re Braat*, 937 F.2d 589, 593, 19 USPQ2d 1289, 1292 (Fed.Cir.1991), the court applied a "two-way" patentability test. In that case, the applicant filed two applications, the second of which issued first due to the PTO's unjustified delays in the prosecution of the earlier filed application. This court also noted that the assignee could not have included the claims of the later-filed Dil application in the Braat application. *Id.* at 593–94. Because "applications for basic and improvement patents should not be penalized by the rate of progress of the applications through the PTO, a matter over which the applicant does not have complete control," this court applied a two-way obviousness analysis. *Id.* at 593. Under the two-way analysis, this court examined each claim to determine whether it was an obvious variant of the other, rather than just examining the application claim for patentable distinctiveness from the patent claim. Although the Dil patent had issued before the pending Braat application, the court determined that the Dil claims were "patentably distinct from the subject matter defined by the claims of Braat." *Id.* at 594. Under this two-way analysis, therefore, this court reversed the Board's double patenting rejection.
>
> In *Goodman,* this court set forth the "one-way" test for obviousness-type double patenting. In that case, the applicant chose to file a continuation for a broad claim while seeking early issuance of a narrow species claim. *Goodman,* 11 F.3d at 1053. This court noted that this

election could gain the patentee "an extension of the term on a species when the broad genus later issued." *Id.* Therefore, because PTO action did not dictate the rate of prosecution, this court looked only to see if the pending application claims were patentably distinct from the issued patent. Under this one-way test, this court upheld the Board's double patenting rejection. *Id.* at 1053–54.

In the instant case, Emert had significant control over the rate of prosecution of the application. The '887 application was filed on October 16, 1986, and initially rejected on July 21, 1987. Emert's subsequent actions had a direct effect on the pace of prosecution. First, Emert received numerous time extensions in various filings. More importantly, after the obviousness rejection in July 1987, Emert waited six months and twice filed a substantially similar continuation application. *See Goodman,* 11 F.3d at 1053 (noting that patentee's election to file a continuation in lieu of seeking an immediate appeal was evidence of patentee's control over the pace of prosecution). Emert did not make a substantive response to the PTO for more than two years after the original rejection. In the meantime, the '624 patent issued. During the critical three-year co-pendent period of the '887 application and the application for the '624 patent, Emert was responsible for the delays in prosecution.

## IV.

Because Emert orchestrated the rate of prosecution for the two applications, this court applies a one-way analysis. Generally, the court must determine whether the claims in the application define an obvious variation of the claim in the earlier issued patent. *See, e.g., General Foods Corp. v. Studiengesells-*

*chaft Kohle mbH,* 972 F.2d 1272, 1278, 23 USPQ2d 1839, 1843 (Fed.Cir.1992). *In re Emert,* 124 F.3d at 1461 (footnote omitted). Thus, in *In re Emert,* the court's entire focus was on whether the PTO or the applicant was responsible for delays in the prosecution of the later-issuing patent, although the court appeared to narrow the focus on responsibility for delay to the "critical ... co-pendent period" of the applications for the two patents.

In *In re Emert,* the court also distinguished its prior decision in *In re Braat* by pointing out that, at the time of the applications in *In re Braat,* the applicant, Phillips, could not have added Braat's claims to the Dil application, because prior to the 1984 amendments to the Patent Act, such "joint inventorship" was not recognized. *See id.* at 1461 n.*. However, the court noted, "After the 1984 Amendments, joint inventorship became possible even if 'each [inventor] did not make a contribution to the subject matter of every claim of the patent.'" *Id.* (quoting 35 U.S.C. § 116(3) (1994)). As shall be seen below, later decisions have seized upon the 1984 amendments as a basis for questioning the continuing validity of the two-way test in *In re Braat* prior to the *Eli Lilly* decision.

### d. *In re Berg*

Next, in *In re Berg,* the court again explained that, "[g]enerally, a 'one-way' test has been applied to determine obviousness-type double patenting,'" *In re Berg,* 140 F.3d at 1432, which is plainly contrary to Donaldson's characterization of the rule prevailing before the *Eli Lilly* decision. The court in *In re Berg* continued,

> Under special circumstances, however, this court and the Court of Customs and Patent Appeals have both made an exception and instead have applied a two-way test. Specifically, in *Braat,* this court examined the application claim and

the patent claim to determine whether each was obvious in view of the other, rather than considering only whether the application claim was patentably distinct from the patent claim. *See* 937 F.2d at 593, 19 USPQ2d at 1292; *see also Borah,* 354 F.2d at 1009, 148 USPQ at 214; *Calvert,* 97 F.2d at 640, 25 C.C.P.A. at 1336. Since *Braat,* many patent applicants facing an obviousness-type double patenting rejection under the one-way test have argued that they actually are entitled to the two-way test. *The two-way test, however, is a narrow exception to the general rule of the one-way test. Indeed, the primary basis for the Braat decision—different inventive entities—was removed by the Patent Law Amendments Act of 1984 (the "1984 Act"). Nevertheless, the notion survives that in certain unusual circumstances, the applicant should receive the benefit of the two-way test. The question then is: when?*

*In re Berg,* 140 F.3d at 1432 (emphasis added). The court then attempted to answer that troubling question.

In *In re Berg,* the applicant argued "that it [wa]s entitled to application of the two-way test because it filed the two applications simultaneously, and therefore cannot be responsible for their rates of prosecution through the PTO." *Id.* at 1432–33. The court rejected that argument, instead accepting one of the two rationales offered by the PTO for applying only a one-way test:

> Although the decision of the Board affirming the application of the one-way test rather than the two-way test to Berg's application is correct, we hold, however, that this case is not appropriate for application of a "control of prosecution rates" analysis to determine whether Berg is entitled to the two-way test. Rather, we base our affirmance on

the second stated rationale of the Board: because Berg could have filed the claims of its separate applications in a single application, and it simply chose to file two applications despite nearly identical disclosures, Berg is not entitled to the two-way test.

*In re Berg,* 140 F.3d at 1433. Thus, "control of prosecution rates" was not the hook on which the court hung its hat, as it had in *In re Braat, In re Goodman* (although the court there identified other considerations, as well), and *In re Emert;* instead, the court focused on whether the applicant could have filed the claims in both of its applications in a single application, noting in its analysis the effect of the change in "inventorship" requirements, which had also been pointed out in *In re Emert.*

The court concluded, first, that the case then before it was not like *In re Braat,* and did not trigger application of the two-way test:

> Berg relies on *Braat* to support application of the two-way test. *Braat* was an unusual case; moreover, its factual situation is not likely to be repeated since the 1984 Act went into effect. *Even assuming that* Braat *retains some vitality, it is, nevertheless, distinguishable. In* Braat *the common assignee could not have filed both sets of claims together because the inventive entity named in the application did not invent the subject matter of all the patent claims and vice-versa. See Braat,* 937 F.2d at 594, 19 USPQ2d at 1293. In addition, in *Braat* the "patent invention . . . [was] totally separate from that of [the application], and could conceivably have been developed earlier rather than later." *Id.* at 593, 937 F.2d 589, 19 USPQ2d at 1292. *The court in* Braat, *however, emphasized the more typical scenario in which, despite common inventive entities, the two-way test applied: "when a later-filed improvement patent issues before an earlier filed ba-

sic invention."* Id. (emphasis added); *accord Borah,* 354 F.2d at 1009, 148 USPQ at 214 (allowing the earlier filed but later allowed basic patent application to issue without a terminal disclaimer because the two applications could not have been filed as one since the improvements were not made until after the application on the basic invention was filed); *see also Calvert,* 97 F.2d at 640, 25 C.C.P.A. at 1336 (allowing an earlier filed patent application for generic invention to issue without a terminal disclaimer after a later filed improvement patent).

> *Furthermore, in the present case, unlike* Braat, *the specifications of the Berg application and of the '916 patent are identical; the two disclosures are almost exactly alike. The invention described in claim 1 of the '916 patent, therefore, is anything but "totally separate" from that of the Berg application.* In fact, the preferred embodiment of practicing the invention disclosed in the written description of both the application and the '916 patent is claimed in claim 1 of the '916 patent. *In addition, both the '916 patent and the application list the same inventive entity, i.e., the same four inventors. Thus all of the excuses accepted by the court in* Braat *are absent here. Finally, unlike* Borah, *the inventions disclosed in both sets of claims had been completed before either application was filed.*

> For its own reasons, Berg chose to file two applications even though conventional practice presumably would have counseled filing one application. *We hold, therefore, that if an applicant can file all of its claims in one application, but elects not to, it is not entitled to the exception of the two-way test.*

*In re Berg,* 140 F.3d at 1433–34 (footnotes omitted; emphasis added). As in *In re*

*Emert,* the court concluded that the circumstances presented were closer to those in *In re Goodman,* than they were to those presented in *In re Braat. Id.* at 1434–35.

The court in *In re Berg* then attempted to clarify the interaction of determinations concerning ability to file both claims simultaneously and control of the prosecution:

> The two-way exception can *only* apply when the applicant could not avoid separate filings, *and even then, only* if the PTO controlled the rates of prosecution to cause the later filed species claims to issue before the claims for a genus in an earlier application. This was the situation in *Borah.* In Berg's case, the two applications could have been filed as one, so it is irrelevant to our disposition who actually controlled the respective rates of prosecution. Because Berg could have filed one application, Berg's case is controlled by factual analogy to and in principle by *Goodman.*

*In re Berg,* 140 F.3d at 1435 (emphasis added). Attempting to identify more generally the circumstances that would permit application of one test or the other, the court in *In re Berg* concluded as follows:

> If an applicant could have filed both sets of claims in a single application because the disclosure of the first application supports the second set of claims, then pursuant to this case and *Goodman,* the one-way test is appropriate to determine if a rejection for obviousness-type double patenting should be sustained.
>
> If, on the other hand, an applicant could not have filed both sets of claims in one application—for example, because the second application claimed an invention that was not adequately disclosed in the first application—but the first application was delayed in prosecution causing the second application to issue as a patent first, then one would expect that the "control test" as discussed in *Borah*

would be applied to determine whether the applicant or the PTO is responsible for the delay. Under this scenario, the one-way test is appropriate to determine whether a rejection for obviousness-type double patenting will be sustained if the applicant is found responsible for the delay in prosecution of the first-filed application. The two-way test may be appropriate, however, in the unusual circumstance that the PTO is solely responsible for the delay in causing the second-filed application to issue prior to the first.

*In re Berg,* 140 F.3d at 1436–37.

### e. *Eli Lilly*

The odyssey of the continued viability of the "two-way" test in precedent of the Federal Circuit Court of Appeals concludes with the decision that is the focus of Donaldson's motion for summary judgment, *Eli Lilly & Co. v. Barr Laboratories, Inc.,* 251 F.3d 955 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002). The court's discussion of the applicable test in that case was comparatively brief, and indeed, was relegated to a footnote:

> A two-way double patenting test does not apply in this case. *The two-way test is only appropriate in the unusual circumstance where, inter alia, the United States Patent and Trademark Office ("PTO") is "solely responsible for the delay in causing the second-filed application to issue prior to the first."* ( [bold] emphasis added). *In re Berg,* 140 F.3d at 1437, 46 USPQ2d at 1233 (Fed.Cir. 1998); *see also In re Goodman,* 11 F.3d 1046, 1053, 29 USPQ2d 2010, 2016 (Fed. Cir.1993) (holding that PTO actions did not dictate the rate of prosecution when Goodman accepted early issuance of species claims and filed a continuation application to prosecute genus claims). *Such circumstances are not present in this case, because the PTO was not sole-*

*ly responsible for the delay.* Indeed, the '549 patent issued in December 1986, approximately eight months after a continuation-in-part was filed, which stemmed from a continuation application, which in turn stemmed from a divisional of the original '379 application that was filed in January 1974. Further, an expert hired on behalf of Lilly in the matters of PTO and corporate intellectual property practice, in discussing claim 7 of the '549 patent, stated: "[I]t is true that the claim could have been presented earlier...." This statement indicates that the delay was not solely caused by the PTO.

*Eli Lilly & Co.*, 251 F.3d at 969 n. 7 (emphasis added).[5]

5. The dissenter in *Eli Lilly*, Circuit Judge Pauline Newman, argued, first, that the "fundamental requirements" of the law of obviousness-type double patenting were not met in that case, because the invalidating patent was filed nine years after the effective filing date of the patent found to be invalid; there was no formal relationship between them; the invalid patent's disclosure was a cited reference against the invalidating patent; and the two patents had different inventorships, such that "[w]hatever the effect the [two] patents may have on each other, it is not 'double patenting.'" *Eli Lilly & Co.*, 251 F.3d at 973 (Newman, C.J., dissenting from the refusal to reconsider the case *en banc*). Next, the dissenter argued that, when two patents are properly considered for obviousness-type double patenting, "an anomaly arises, for example, when the claims of patent B are 'obvious' in light of the claims of patent A, but the claims of patent A are not obvious in light of the claims of patent B." *Id.* at 975. This "anomaly" can be avoided, the dissenter argued, "[b]y applying the rules of cross-reading, ... that is, unless the claims of each patent would have been obvious in view of the claims of the other patent," *id.*—which is essentially the "two-way test" of whether the claims of the two patents are "patentably distinct." The dissenter described the majority's holding of invalidity based on obviousness-type double patenting to be "truly anomalous" under the circumstances in which the invalidated invention "was made and applied for nine years before the asserted 'prior art' was filed." *Id.* The dissenter then criticized the majority's characterization of *In re Berg* as requiring that, unless the PTO is *solely* and *exclusively* responsible for all delays in issuing the first-filed patent, the patentee cannot rely on the fact of its earlier filing, because, the dissenter said, "[t]hat is not the *Berg* holding." *Id.* Rather, according to the dissenter, the holding in *Berg* was that the holder of the later-issued patent "was not entitled to the benefits of the two-way test because he could have included all of the claims in a single application." *Id.*

Although this court sees considerable merit in the analysis of the dissenter in *Eli Lilly*, it must nevertheless follow the majority's rule. However, the court also does not see as large a misconstruction or misapplication of *In re Berg* in the majority's decision in *Eli Lilly* as did the dissenter. In *In re Berg*, the court expressly held "that if an applicant can file all of its claims in one application, but elects not to, it is not entitled to the exception of the two-way test," and that the applicant in that case could, indeed, have filed all of its claims in one application. *See In re Berg*, 140 F.3d at 1434. However, the court in *In re Berg* also explained that "[i]f ... an applicant could *not* have filed both sets of claims in one application"—which is the circumstance that the dissenter asserted obtained in *Eli Lilly* where one invention and filing preceded the other by nine years—"but the first application was delayed in prosecution causing the second application to issue as a patent first, then one would expect that the 'control test' as discussed in *Borah* would be applied to determine whether the applicant or the PTO is responsible for the delay." *Id.* at 1437. Where that scenario obtained, the only question for determining whether or not the one-way or the two-way test applied, according to the court in *In re Berg*, was who was responsible for the delay in prosecution: "[T]he one-way test is appropriate ... if the applicant is found responsible for the delay in prosecution of the first-filed application," while "[t]he two-way test may be appropriate ... in the unusual circumstance that the PTO is solely responsible for the delay in causing the second-filed application to issue prior to the first." *Id.* Thus, the majority in *Eli Lilly* applied a one-way test of obviousness-type double patenting in the circumstances in which the court in *In re Berg* also stated that such a test should apply.

Thus, the decision in *Eli Lilly* applied a one-way test solely on the basis of a "control test" concerning prosecution of the later-issued patent, and, moreover, on the basis that the PTO was not *solely* responsible for any delay in the prosecution of the later-issued patent. However, as the survey of cases above demonstrates, neither the "control test" nor the statement of that test in terms of whether the PTO was *solely* responsible for any delays was a "new" formulation. Rather, the "control test" had been recognized at least since *In re Braat,* and the statement of the "control test" in *Eli Lilly* was, in fact, drawn directly from *In re Berg.* Furthermore, the requirement in *In re Berg* that the two patents with common ownership could not have been filed in the same application before the "control test" became a consideration, *see In re Berg,* 140 F.3d at 1437 ("If, on the other hand, an applicant could not have filed both sets of claims in one application ... but the first application was delayed in prosecution causing the second application to issue as a patent first, then one would expect that the 'control test' as discussed in *Borah* would be applied to determine whether the applicant or the PTO is responsible for the delay."), was also satisfied in *Eli Lilly,* because the application for the one patent preceded the other by nine years, at least according to the dissent. *See Eli Lilly,* 251 F.3d at 973 (Newman, C.J., dissenting from the refusal to reconsider the case *en banc* ).

### 3. The applicable test

For a number of reasons, the court finds that it is appropriate to rely upon *In re Berg,* rather than upon *Eli Lilly,* as the better formulation of the circumstances under which either the one-way or the two-way test should apply. First, the court finds that *In re Berg* provides the most complete statement of the circumstances· in which either the one-way or the two-way test should apply. *See In re Berg,* 140 F.3d at 1436–37. Second, *In re Berg* is not inconsistent with preceding decisions in *In re Emert* and *In re Goodman,* or the principles stated *In re Braat,* and adequately distinguishes *In re Braat* on factual grounds and on the basis of the law then governing inventorship. *See id.* at 1433–34. Finally, *In re Berg* is not inconsistent with, and instead is the basis for, the determination of the test applicable in *Eli Lilly. See Eli Lilly,* 251 F.3d at 968 n. 7 (citing *In re Berg,* 140 F.3d at 1437, as stating the authority for applying the one-way test in the circumstances presented). Therefore, the court will follow the analysis outlined in *In re Berg.*

### a. Could EPC have filed both sets of claims in one application?

Under *In re Berg,* the first consideration is whether the claims in the '456 patent and the '728 patent could have been filed in one application. *See In re Berg,* 140 F.3d at 1436 (the one-way test applies where the applicant could have filed both sets of claims in one application), *and compare* 1433 (expressly holding that the one-way test applies where the applicant could have filed the claims of the two patents in a single application, and under such circumstances, it was unnecessary to consider the "control test" to decide whether or not the two-way test should apply), 1434 (again "hold[ing] ... that if an applicant can file all of its claims in one application, but elects not to, it is not entitled to the exception of the two-way test"), 1435 (reiterating

While the rule that the one-way test applies unless the PTO was *solely* responsible for delays in prosecution of the later-issued patent does not cure the "anomaly" recognized by the dissenter in *Eli Lilly,* it does reasonably turn upon another interest, which is punishment of the party responsible for delay in the prosecution of an earlier-filed, but later-issued patent by the same inventor.

that the PTO had correctly applied the one-way test, because "[t]he two-way exception can *only* apply when the applicant could not avoid separate filings, *and even then, only if* the PTO controlled the rates of prosecution to cause the later filed species claims to issue before the claims for a genus in an earlier application") (emphasis added). On that issue, Donaldson argues that Nelson *could have filed* the applications for the '456 patent and the '728 patent in a single application. Donaldson points out that Nelson abandoned allowed claims and filed a continuation of what later became the '456 patent in March 1980, then amended the application in October 1980 only about four months *before* filing the application for the '728 patent on February 9, 1981. Donaldson argues that further amendment of the '456 patent application could have been made to include the "novel reset structure" of the '728 patent in the same application. EPC argues to the contrary, contending that it is undisputed that the invention of the '456 patent and the invention of the '728 patent occurred at separate times, such that the inventor could not have included all of the claims of the two patents in a single application.

The court concluded, above, in construing the claims of the two patents, that the inventions were not "totally separate." Rather, as in *In re Berg,* the invention claimed in claim 1 of the '728 patent is almost exactly like the invention claimed in claim 1 of the '456 patent, up until the limitations claiming the "novel reset structure" of the '728 patent. *See In re Berg,* 140 F.3d at 1434 ("The invention described in claim 1 of the '916 patent ... is anything but 'totally separate' from that of the Berg application," where "the specifications of the Berg application and of the '916 patent are identical; the two disclosures are almost exactly alike"). Nevertheless, the court concludes that there is, or may be, a genuine issue of fact as to

whether or not the inventor of both patents could have included both sets of claims in a single application. Even though there is considerable similarity in the claims of the two patents, and allowed claims of the '456 patent had been abandoned, amendments offered, and the application was still pending at the time that the application for the '728 patent was filed, there does not appear to be any dispute that the two patents had different invention dates several years apart.

Nevertheless, this genuine issue of fact is not sufficiently "material," standing alone, to preclude summary judgment. *See Eli Lilly,* 251 F.3d at 962 ("A disputed fact is material if it might affect the outcome of the suit such that a finding of that fact is necessary and relevant to the proceedings.") (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). Rather, under *In re Berg,* inability to avoid separate filings is only the first of *two* sequential preconditions for application of the two-way test: "The two-way exception can *only* apply when the applicant could not avoid separate filings, *and even then, only if* the PTO controlled the rates of prosecution to cause the later filed ... claims to issue before the claims ... in an earlier application." *See In re Berg,* 140 F.3d at 1435 (emphasis added). The court, therefore, turns to the second of those sequential preconditions, to consider whether the PTO or the applicant was responsible for the delay in prosecution of the '456 patent, which caused the '728 patent to issue first. *Id.*

### b. Was the PTO solely responsible for any delay?

In this case, even if the inventor could *not* have avoided two separate applications, as EPC contends, there is no genuine issue of material fact that the "control test" requires application of the one-way test to the question of whether the two

patents are patentably distinct in the circumstances presented here. *In re Berg,* 140 F.3d at 1437. This is so, because the PTO is *not* "solely responsible for the delay in causing the second-filed application [for the '728 patent] to issue prior to the first [for the '456 patent]." *See id.; Eli Lilly,* 251 F.3d at 968 n. 7 ("The two-way test is only appropriate in the unusual circumstance where, *inter alia,* the United States Patent and Trademark Office ('PTO') is *'solely* responsible for the delay in causing the second-filed application to issue prior to the first.' ") (quoting *In re Berg,* 140 F.3d at 1437) (emphasis added by the *Eli Lilly* court).

The side-by-side comparison of prosecution histories of the two patents, which appears *supra,* in Section I.B.2., plainly demonstrates that the PTO was not solely responsible for the delay in the prosecution and issuance of the '456 patent, not even during the "critical ... co-pendent period" of the two applications. *In re Emert,* 124 F.3d at 1461. After filing the application for what ultimately became the '456 patent on June 19, 1978, the inventor requested extensions of time on January 11, 1979, and February 12, 1979, the second with a request for streamlined continuation, then filed a request for another extension of time on September 27, 1979, after rejection of all claims on July 2, 1979. Although claims were allowed on December 4, 1979, the inventor abandoned the allowed claims on March 18, 1980, and requested a second streamlined continuation followed by an amendment on October 2, 1980. Just four-and-one-half months later, on February 17, 1981, the PTO rejected all pending claims. Only eight days before that rejection, on February 9, 1981, the same inventor had filed an application for what became the '728 patent. During the twenty-three months that the application for the '728 patent was co-pending, in the prosecution of the '456 patent, the inventor requested two extensions of time,

on May 18, 1981, and June 16, 1981, the second with another conditional abandonment and a third streamlined continuation application. Although EPC makes much of the fact that the PTO did not thereafter respond for some twenty-one months, until March 31, 1983, at which time the PTO rejected pending claims 1 through 18, it cannot be said that the PTO's delay was solely, or even substantially, responsible for the delay that allowed the '728 patent to issue first, on January 23, 1983. Rather, the inventor had *already* substantially delayed the prosecution of the patent before and *during* the co-pendency period. Under these circumstances, the court concludes, as a matter of law, that only the one-way test is applicable to the question of whether the '456 patent is patentably distinct from, or is instead only an obvious variation of, the earlier-issued '728 patent.

### 4. Scope of the comparison

Again, at the second step in the analysis of obviousness-type double patenting, the court "must decide whether [any] difference renders the claims patentably distinct." *Eli Lilly,* 251 F.3d at 969; *In re Goodman,* 11 F.3d at 1052 (because the claimed inventions were not identical in scope, the court was required to determine, at the second step of the analysis, whether the differences defined only an "obvious variation" or a "patentable distinction"). Under the one-way test, which this court has now held is applicable under the circumstances of this case, the court looks for patentable distinctions from only one direction, "ask[ing] whether the application claims [or claims of the later-issued patent] are obvious over the patent claims [or claims of the earlier-issued patent]." *In re Berg,* 140 F.3d at 1432 (citations omitted); *In re Emert,* 124 F.3d at 1461 (identifying the same analysis for a one-way test). Nevertheless, what remains an

open question is the precise scope of the comparison between the two patents.

### a. Scope of comparison as framed by the parties

Donaldson initially argued that the '456 patent was not patentably distinct from the '728 patent under a one-way test, because the only significant difference between the independent claims of the two patents was that claim 1 of the '728 patent claimed the novel reset structure, a distinction not considered under a one-way test. Consequently, Donaldson argued that the '456 patent is invalid on obviousness-type double patenting grounds. In response, EPC argued that, even under a one-way test, the '456 patent is patentably distinct from the '728 patent, because dependent claims 2 and 3 of the '456 patent—which claim the "guiding means," first in means-plus-function form, then in terms of a specific structure—are patentably distinct from claim 1 of the '728 patent. EPC also argued that claim 1 of the '456 patent is patentably distinct from the '728 patent under a two-way test. This latter argument is EPC's *only* argument that claim 1 of the '456 patent, standing alone, is patentably distinct from claim 1 of the '728 patent, but it is foreclosed by the court's determination, just above, that only the one-way test applies in the circumstances presented here.

The court notes that Donaldson does not appear to have argued that, under a one-way test, the *only* proper comparison is claim-to-claim, which would have allowed only a comparison of each of the independent and dependent claims of the '456 patent *in turn* against claim 1 of the '728 patent, with the court making a separate determination of obviousness-type double patenting as to each claim. Rather, in response to EPC's argument that the '456 patent is patentably distinct from the '728 patent on the basis that claims 2 and 3 of the '456 patent are patentably distinct

from claim 1 of the '728 patent, even under a one-way test, Donaldson has countered that the matter claimed in claims 2 and 3 of the '456 patent *is* claimed in claim 1 of the '728 patent and/or is obvious over claim 1 of the '728 patent *in light of prior art.* Thus, *as framed by the parties*, the scope of comparison is between claims 1, 2, and 3 of the '456 patent, taken as a whole or as a "composite invention," on the one hand, and claim 1 of the '728 patent, on the other.

### b. Apparent uncertainty of the case law

Although not convinced that the arguments of the parties properly frame the question of whether only a claim-to-claim comparison is proper—such that individual claims of the '456 patent could be separately invalidated for obviousness-type double patenting—the court nevertheless considers it appropriate to address that question in its attempt to determine whether the '456 patent is invalid for obviousness-type double patenting over the '728 patent, as asserted in Donaldson's motion for summary judgment. Unfortunately, the court finds itself at something of a loss to decide whether such claim-to-claim comparison and potential invalidation is the proper rule in light of Federal Circuit precedent, or whether the rule is, instead, that the court must consider the independent and dependent claims of the '456 patent as a whole to determine whether the "composite invention" defined by those claims is patentably distinct from the '728 patent. *Compare Eli Lilly*, 251 F.3d at 968 (suggesting a claim-to-claim comparison of two patents by casting the steps in the analysis of obviousness-type double patenting in terms of construction and comparison of "the *claim* in the earlier patent" and "the *claim* in the later patent," although it does not appear that the parties ever asserted that more than one claim of either patent

was pertinent to the comparison) (emphasis added); *In re Goodman,* 11 F.3d at 1053 (in a case involving a patent application and an earlier-issued patent, suggesting that, not only is the comparison to be made claim-to-claim, but that invalidity of one claim can render invalid other claims from which the invalid claim depends, because the court concluded that, under a one-way test, "Claim 12 and Claim 13 [of the application] are generic to the species of invention covered by claim 3 of the patent," then held that, where claim 12 was dependent on claim 11, which was in turn dependent on claim 10, claims 10 through 12 all failed, as well as claim 13); *with In re Berg,* 140 F.3d at 1432 (suggesting comparison of the composite of all claims of an application with the composite of all claims of an earlier-issued patent, explaining that, under a one-way test, "the examiner asks whether the application *claims* are obvious over the patent *claims*," and under a two-way test, "the examiner also asks whether the patent *claims* are obvious over the application *claims*") (emphasis added); *In re Emert,* 124 F.3d at 1461 (also suggesting consideration of the composite of all claims of an application with the claim of an issued patent by stating, in the course of applying the one-way test, that the court "must determine whether the *claims* in the application define an obvious variation of the *claim* in the earlier issued patent") (emphasis added). Nor does the court believe that the apparent confusion among the precedents can be resolved by noting whether the court in each of the cited cases was examining two patents *that had both issued,* as is the case here, or was instead considering a patent *application* in light of an *earlier-issued patent.* This is so, even though *Eli Lilly* appears to be the only case involving two patents that had both already issued, because of the lack of any indication in *Eli Lilly* that more than one claim of either patent was ever assert-

ed by the parties to be pertinent to the comparison.

Thus, this court is simply unable to tell from these authorities on obviousness-type double patenting whether dependent claims of a later-issued patent that are patentably distinct from an independent claim of an earlier-issued patent would (1) "save" themselves from invalidation for obviousness-type double patenting, while the independent claim from which they depend is separately invalidated for lack of a patentable distinction by itself; (2) also "save" from invalidation the independent claim from which the patentably distinct dependent claims depend, even if the independent claim from which they depend is not patentably distinct by itself, because the independent and dependent claims should be treated as a whole or as a "composite invention"; or (3) fail to "save" any part of the patent from invalidation, if the independent claim is not patentably distinct by itself, such that the "fate" of the dependent claims, even if they are patentably distinct from an earlier-issued patent, is tied to whether or not the independent claim from which they depend is also patentably distinct.

### c. Consideration of other principles

However, other authorities and principles of patent law suggest what must be the proper choice among these alternatives. Pursuant to statute, all claims of a patent are "presumed valid independently of the validity of the other claims." 35 U.S.C. § 282. Thus, even where a party seeks to invalidate a patent for "obviousness," and an independent claim is found to be invalid for obviousness, the court must consider, separately, whether each of the dependent claims depending from that invalid, independent claim is *also* invalid, and cannot simply invalidate the dependent claims on the basis of the invalidity of the independent claim from which they

depend. *See, e.g., Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.*, 264 F.3d 1344, 1356 (Fed.Cir.2001) ("Because dependent claims contain additional limitations, they cannot be presumed to be invalid as obvious just because the independent claims from which they depend have properly been so found. Thus, since Resco offered insufficient evidence to support its argument that [dependent] claims 2, 4–18, and 20–21 are invalid as a matter of law, the district court erred in holding those claims invalid on summary judgment [on the basis of the invalidity of independent claims 1 and 19]."). This court cannot see why the rule should be different for obviousness-type double patenting, at least where both patents being compared have already issued. Thus, § 282 requires some kind of claim-to-claim comparison, and a dependent claim that is patentably distinct, in a claim-to-claim comparison should "save" itself from invalidity on the basis of obviousness-type double patenting, even if it cannot also "save" the independent claim from which it depends. Thus, these authorities suggest that alternative (1), at the very least, is correct.

Moreover, the principle stated in § 282 should also mean that a patentably distinct dependent claim does not "share the fate" of invalidity, on obviousness-type double patenting grounds, of the independent claim from which it depends. Thus, alternative (3) above is also eliminated as a contender for the correct rule.

General principles of invalidity for obviousness also counsel treating the independent and dependent claims of the earlier patent as a whole or as a "composite invention." Federal Circuit precedent holds that, when determining "obviousness," the claimed invention should be considered as a whole, because there is no legally recognizable "heart" of the invention. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1548 (Fed.Cir.1983), *cert. de-*

*nied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *see also Para-Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.*, 73 F.3d 1085, 1087 (Fed.Cir.1995) (citing *W.L. Gore* for this proposition), *cert. denied*, 519 U.S. 822, 117 S.Ct. 80, 136 L.Ed.2d 38 (1996); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1383 (Fed.Cir.1986) ("Focusing on the obviousness of substitutions and differences instead of on the invention as a whole, as the district court did in frequently describing the claimed invention as the mere substitution of monoclonal for polyclonal antibodies in a sandwich assay, was a legally improper way to simplify the difficult determination of obviousness."), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). Moreover, it makes sense, in light of the relative timing of the *invention of,* and *applications for,* the two patents at issue here, to consider the independent and dependent claims of the '456 patent as a whole or "composite invention," at least for purposes of obviousness-type double patenting. As explained above, claim 1 of the '728 patent is significantly different, and was presumably patentably distinct from, claim 1 of the '456 patent only because the last limitation of claim 1 of the '728 patent added the "novel reset structure" not found in claim 1 of the '456 patent. An inventor aware of the application for the '456 patent—as Joseph Nelson obviously was, because he was the inventor of both the '456 patent and the '728 patent—would necessarily attempt to make claim 1 of the later application for the '728 patent patentably distinct from claim 1 of the earlier-filed application for the '456 patent. In this case, the inventor did, in fact, do so, or attempt to do so, by adding the "novel reset structure" *as a limitation in the independent claim of the later application for the '728 patent.* The court sees no reason why that "novel reset structure" could not have been claimed *as a dependent claim,* assuming that the re-

mainder of claim 1 of the '728 patent would have been patentable without it (which it would probably have been in the absence of the '456 patent), *rather than as a limitation of the first, independent claim.* By the same token, had it been necessary, or foreseeable that it would be necessary, at the time of the application for the '456 patent, to distinguish the independent claim of the '456 patent from claim 1 of the '728 patent, the court sees no reason why dependent claims 2 and 3 of the '456 patent could not have been claimed *as limitations of the independent claim,* rather than as *dependent claims.*

The court held, above, that there were, or might be, genuine issues of material fact as to whether or not the claims of the '728 patent could have been included in the application for the '456 patent, where the application for the '456 patent was *still pending* when the application for the '728 patent was made. However, there is no genuine issue of material fact that the claims of the '728 patent could *not* have been included in the *original* application for the '456 patent. This is so, because there is no genuine issue of material fact that *the original application for the '456 patent was filed well before the invention date of the invention claimed in the '728 patent.* Thus, there was no foreseeable need to distinguish the independent claim of the '456 patent application from a non-existent independent claim of the '728 patent by incorporating into the independent claim of the '456 patent application what could otherwise be, and was in fact, claimed in two dependent claims. In these circumstances, it would seem that the independent and dependent claims of the earlier-filed, but later-issued patent should be treated as a whole or "composite invention," such that patentably distinct dependent claims should "save" not only themselves from invalidation on obviousness-type double patenting grounds, but also "save" from invalidation the independent claim from which they depend, even if the independent claim from which they depend is not patentably distinct by itself.

For these reasons, the court concludes that the proper rule, under the circumstances presented in this case, is alternative (2) above: A patentably distinct dependent claim "saves" from invalidation not only itself, but also the independent claim from which the patentably distinct dependent claim depends, even if the independent claim from which the dependent claim depends is not patentably distinct by itself. To put it another way, the independent and dependent claims of a later-issued patent should be treated as a whole or as a "composite invention" for purposes of determining whether that patent is invalid for obviousness-type double patenting over an earlier-issued patent to the same inventor.

Even if alternative (2) might not *ordinarily* be the applicable rule in cases such as this, that alternative *is nevertheless the rule here.* This is so, because the parties have treated independent claim 1 and dependent claims 2 and 3 of the '456 patent as a composite, for purposes of obviousness-type double patenting, and the court finds that absent from this case is any express argument that individual claims that lack a patentable distinction must be separately invalidated for obviousness-type double patenting. Therefore, if any one of this group of claims of the '456 patent is "patentably distinct" from the '728 patent, then the composite of claims 1, 2, and 3, of the '456 patent would also be patentably distinct, and hence, the '456 patent *would not be* invalid for obviousness-type double patenting over the '728 patent.

### 5. Are there patentable distinctions under the applicable test?

#### a. The independent claims

The court's analysis of patentable distinctions under the one-way test begins

with a comparison of the independent claims of the two patents, claim 1 of the '456 patent and claim 1 of the '728 patent. The court provided a side-by-side comparison of the language of these two claims *supra,* in Section II.F.1.a. Thereafter, in its claim construction, this court noted that EPC has argued that there is only one *significant* difference between claim 1 of the '456 patent and claim 1 of the '728 patent, which EPC identifies as the additional limitation in claim 1 of the '728 patent claiming a novel reset structure that prevents the structure from being rendered ineffective owing to clogging by dirt or ice. Under a one-way test, however, this difference does not establish any "patentable distinction," because the court examines differences only from the "other" direction, that is, the court examines *only* whether the claim of the later-issued patent, the '456 patent here, is obvious over the claim of the earlier-issued patent, the '728 patent here. *See, e.g., In re Berg,* 140 F.3d at 1432 (one-way test); *see also In re Braat,* 937 F.2d at 593 (concluding, under the first, or one-way, part of a two-way test, that the *omission* from the later application of a limitation found in the earlier-issued patent would not constitute an "unobvious modification").

Where the later-issued patent claim fails to provide any novel invention over a claim of an earlier-issued patent, as is the case here, the claim of the later-issued patent is not patentably distinct from the earlier claim. *See Eli Lilly,* 251 F.3d at 970 ("[A] later patent claim that fails to provide novel invention over an earlier claim is not patentably distinct from the earlier claim"); *In re Berg,* 140 F.3d at 1432 (under a one-way test, "[i]f the application claim is not patentably distinct," it cannot overcome a double-patenting rejection in the absence of a terminal disclaimer); *In re Emert,* 124 F.3d at 1461 (under a one-way analysis, "the court must determine whether the claims of the application define an obvious variation of the claim in the earlier issued patent," and if not, the application claims fail for obviousness-type double patenting). Therefore, claim 1 of the '456 patent is not patentably distinct from claim 1 of the '728 patent. The question in this case, however, as construed above, is whether dependent claims 2 and 3 of the '456 patent render the "composite invention" patentably distinct from claim 1 of the '728 patent, notwithstanding the lack of any patentable distinction of claim 1 of the '456 patent from claim 1 of the '728 patent.

### b. The dependent claims in light of the '728 patent

A different situation may obtain as to whether dependent claims 2 and 3 of the '456 patent are patentably distinct from claim 1 of the '728 patent, because this court's construction of those claims demonstrated that they include distinctions from claim 1 of the '728 patent. Specifically, as explained *supra,* in Section II.F.2.b.i., the dependent claims of the '456 patent claim a "guiding means"—first in means-plus-function form in claim 2, and then in the form of a specific structure in claim 3—that is nowhere expressly claimed in the '728 patent.

The question, of course, is whether these distinctions are "patentable" distinctions. Donaldson argues, first, that they are not, because claim 1 of the '728 patent does indeed claim the "guiding means" claimed in claims 2 and 3 of the '456 patent. This contention is foreclosed, however, by this court's construction of claims 2 and 3 of the '456 patent. Construing the means-plus-function claim in claim 2 in light of the corresponding structure in the written description, this court concluded that the "guiding" function is *not* performed *solely* by the "tubular guiding member 76," but

also by the "bore 74"—more specifically described in claim 3 as a "tubular hub portion"—through which the "tubular guiding member" is "slidably disposed . . . *so as to guide the vertical movement of the member 62.*" The '456 patent, col. 4, Description of the Preferred Embodiment, *ll.* 33–47 (emphasis added). This court concluded that the language of the claim plainly suggests the interaction of two or more mechanical components, the interaction of which guides the indicating member, or holds it in a required alignment, as the diaphragm moves between its infold and outfold positions. *See* the '456 patent, claim 2. Therefore, even though claim 1 of the '728 patent claims a "cylindrical rod," and even if this structure is analogous to the "tubular member" that is one of the

mechanical elements performing the "guiding" function in claim 2 of the '456 patent, nowhere *in claim 1 of the '728 patent* is there any *claim* of any structure as performing a "guiding" function, nor is there any reference in that *claim* to any structure analogous to the "bore" or "tubular hub" through which the "cylindrical rod" is "slidably disposed" so as to guide the movement of the indicating member as the diaphragm moves.[6] Thus, as a matter of claim construction, this court concluded, claim 1 of the '728 patent neither explicitly nor inherently claims the guiding means claimed in claims 2 and 3 of the '456 patent. Thus, contrary to Donaldson's first argument on this point, claims 2 and 3 would appear to render the '456 patent patentably distinct from the '728 patent

6. The court acknowledges that there are references to the "cylindrical rod" of the '728 patent as a "tubular guide 78" in the Description of the Preferred Embodiment in the '728 patent. *See* the '728 patent, Description of the Preferred Embodiment, col. 3, *l.* 37. The pertinent paragraph of the Description is as follows:

> A centrally disposed, tubular guide 78, formed as an integral part of the member 70, and extends upwardly, in the chamber 38 from the bottom wall 72 and into the bore 46. The outer diameter of the guide 78 is slightly less than the inner diameter of the bore 46 so that air may pass therebetween and so that the guide may freely slide within that bore. The guide 78 extends through a sealed, central opening in the bottom wall 64 of the diaphragm 62 and has a central coaxial bore 80 therein that opens into the lower portion 82 of the chamber 38, i.e., the portion of the chamber below the diaphragm 62. An integral, radially inwardly projecting flange 84 is formed about the bore 80, adjacent to, but spaced slightly upwardly from, the open, downwardly facing end 86 of the bore 80. The guide 78 has a length so that it cannot to be [sic] fully withdrawn from within bore 46 when the diaphragm 62 is folded in upon itself as shown in FIG. 3.

The '728 patent, Description of the Preferred Embodiment, col. 3, *ll.* 37–54. Even in this description, however, there is no suggestion that a "guiding function" is performed by the interaction of the "guide 78" and the "bore 80," which is the construction placed upon the "guiding means" to perform the "guiding" function of claim 2 of the '456 patent.

More important, however, is the fact that nothing in the *claim language* of claim 1 of the '728 patent suggests a "means-plus-function" claim for means for performing a guiding function, which might require recourse to the written description to determine the structure performing the claimed function. *See, e.g., BBA Nonwovens Simpsonville, Inc.,* 303 F.3d at 1343, 2002 WL 1998540 ("[N]ext [the court must] identify the corresponding structure in the written description necessary to perform that function."). Finally, as EPC repeatedly argues, "double patenting is a matter of what is *claimed," Georgia–Pacific Corp.,* 195 F.3d at 1326 (emphasis added), so that what appears in a description is of no moment where such a description is not pertinent to claim construction. This court pointed out in its comparison of claims 2 and 3 of the '456 patent with claim 1 of the '728 patent that the functions of the "cylindrical rod" in claim 1 of the '728 patent are specified to be housing the "pivoting means" of the "locking member" and "cooperating" with the "locking member" to "progressively lock" and "maintain" the indicator in place. *See* the '728 patent, claim 1 (quoted in full *supra,* in Section II.F.1.a.).

when the independent and dependent claims of the '456 patent are treated as a whole or as a "composite invention." At a minimum, the apparent patentable distinctiveness of the dependent claims should "save" those claims from obviousness-type double patenting.

### c. The impact of prior art

*i. Arguments of the parties.* Donaldson, however, also contends that the "guiding means" of claims 2 and 3 of the '456 patent are obvious over the '728 patent *in light of prior art.* Specifically, Donaldson contends that the "guiding means" of claims 2 and 3 would have been obvious to a person of ordinary skill in the art in light of two patents issued to Richard Nelson, the brother of Joe Nelson, the inventor of the '456 patent and the '728 patent, and identified by Donaldson as United States Patent No. 3,939,457 (the '457 patent) and United States Patent No. 4,033,733 (the '733 patent). Donaldson points out that Joe Nelson identified both patents as "prior art" to the '456 patent.[7]

EPC contends that Donaldson's reliance on "prior art" is meritless, because even supposing that similar structures are disclosed in the identified prior art, which EPC contests, the "guiding means" disclosed in the identified prior art is not *claimed* therein as part of the invention, it is employed in an entirely different invention, with different performance requirements, and different structures, and that, without the benefit of hindsight, there was

no motivation for one of ordinary skill in the art to combine that prior art with the invention of the '456 patent or the '728 patent. EPC also argues that the Richard Nelson patents were identified as prior art in the application for the '456 patent, such that the presumption of the correctness of PTO's determination that the '456 patent was patentable over those prior patents must be, but has not been, overcome for Donaldson's argument to prevail. Finally, EPC argues that objective evidence of nonobviousness confirms that the combination of the prior art with the invention of the '456 patent was not obvious.

In its surreply, Donaldson argues that it is ludicrous to imagine that a person of ordinary skill in the art contemplating the '456 patent would not have thought of incorporating the guiding means of the '733 patent into the later invention. Donaldson points out that the inventor of the '456 patent distinguished that invention from the '457 and '733 patents only on the basis that the prior art references did not disclose the "locking" mechanism of the '456 patent, not that the "guiding means" claimed in the '456 patent was patentably distinct from the prior art references. Donaldson also discounts EPC's contention that the prior art involved a different invention, or that the structures involved are patentably distinct.

■ *ii. Authority to consider prior art.* Donaldson is correct in its assertion that, in *In re Longi,* 759 F.2d 887 (Fed.Cir.

---

7. EPC contended that the prior art did not teach the guiding means claimed in the '456 patent, *inter alia,* because of objective indicia of nonobviousness, including the failure of Donaldson to include any "guiding means" in its air filter restriction indicators before the Donaldson Air Alert. Donaldson disputed that contention, but waived any reliance on its own devices as "prior art," first, by choosing not to contest, for purposes of summary judgment, EPC's expert's conclusion that the

Donaldson Informer does not include a guiding means. *See* Donaldson's Surreply Brief at 10 n.4. Second, although Donaldson argued that other prior art included its own Service Indicator, which Donaldson also contended discloses a "guiding means" rendering claims 2 and 3 of the '456 patent "obvious," Donaldson let that argument drop. Therefore, only the two Richard Nelson patents need be considered as "prior art" here.

1985), the Federal Circuit Court of Appeals incorporated consideration of "prior art" into a determination of patentable distinctions for purposes of an obviousness-type double patenting analysis. The court wrote, "Under [obviousness-type] double patenting, we must direct our inquiry to whether the claimed invention in the application for the second patent would have been obvious from the subject matter of the claims in the first patent, *in light of the prior art*." *In re Longi*, 759 F.2d at 893 (emphasis added). The court in *In re Longi* subsequently explained that the pertinent inquiry is "whether the prior art discloses to one of ordinary skill in the art [the claim] embodied in the current invention," and, in that case, considered the teachings of four prior art references. *Id.* at 896.

Although this consideration of the teachings of "prior art" has not been repeated with dogmatic consistency in subsequent cases involving obviousness-type double patenting, there are indications of its continued viability as part of the analysis. For example, in *Eli Lilly*, in construing claims, the court also noted that "[a] person of ordinary skill in the art would have recognized that fluoxetine hydrochloride is a pharmaceutically-acceptable salt of fluoxetine," and that, in fact, "hydrochloride salts are the most common pharmaceutically acceptable salts of basic drugs, and hence are obvious compounds." *Eli Lilly*, 251 F.3d at 969. In *Eli Lilly*, in the context of determining whether there were patentable distinctions between the patents, the majority also likened the case to *Burroughs Wellcome Co. v. Barr Labs., Inc.*, 40 F.3d 1223 (Fed.Cir.1994), *cert. denied sub nom. Novopharm, Inc. v. Burroughs Wellcome Co.*, 516 U.S. 1071, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996), in which the dissenter had recognized that the challenged patent should have been invalidated for double patenting, because the method claimed in the patent at issue there was

" 'an inherent, inevitable result of the practice of the *other method patents* claiming treatment of HIV or AIDS.' " *Id.* at 971 (quoting *Burroughs Wellcome Co.*, 40 F.3d at 1225 (Lourie, J., dissenting in part)) (emphasis added). The court in *Eli Lilly* consequently concluded that there was no patentable distinction between administering fluoxetine hydrochloride for treatment of anxiety and inhibition of serotonin uptake by administration of fluoxetine hydrochloride, thus incorporating its determination of what the prior art taught about pharmaceutically-acceptable salts of fluoxetine. *Id.*

On the other hand, several cases subsequent to *In re Longi* provide no reference to consideration of patentable distinctions "in light of the prior art," instead appearing to focus entirely on what is *claimed* in the earlier- and later-issued patents to the same inventor. *See In re Berg*, 140 F.3d at 1432–33 (the only references were to the claims of "the application" and the claims of "the '916 patent," for purposes of applying either the one-way test or the two-way test of obviousness-type double patenting, with no reference to consideration of "prior art" as part of the application of either test); *In re Emert*, 124 F.3d at 1461–62 (in a full-scale application of the one-way test, only the claims of the two patents were considered, without reference to any "prior art" as pertinent to the determination of whether or not the claims of the application were obvious over the claims of an earlier issued patent); *In re Goodman*, 11 F.3d at 1053 (finding that certain claims of the application were "generic to the species of invention covered by" a claim of the patent, without reference to any "prior art"); *In re Braat*, 937 F.2d at 594 (determining that application claims were patentably distinct from claims of a patent under a two-way test, again without reference to any "prior art"); *see generally Georgia–Pacific Corp.*, 195 F.3d at 1326

("double patenting is a matter of what is *claimed* ") (emphasis added). It is difficult to imagine that there was simply no prior art for any of the patents or applications at issue in these cases. Nevertheless, because there is some authority for consideration of the impact of prior art in analysis of obviousness-type double patenting, the court will entertain this prong of Donaldson's argument.

■ *iii. Extent to which prior art should be considered.* Although the court accepts that consideration of "prior art" may be pertinent to obviousness-type double patenting, the court is not convinced that consideration of "prior art" in this context necessarily is precisely the same as the consideration given to prior art when a party makes a more general challenge to the validity of a patent on "obviousness" grounds, as Donaldson contends. As the Federal Circuit Court of Appeals recently explained, invalidity on "obviousness" grounds has the following statutory basis and requirements for proof:

A patent claim is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (2000). All patents, however, are presumed to be valid. *Id.* § 282. Consequently, a party seeking a judgment that a patent is obvious bears the burden of demonstrating by clear and convincing evidence that the teachings of the prior art would have suggested the claimed subject matter to one of ordinary skill in the art. *See Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1124, 56 USPQ2d 1456, 1459 (Fed.Cir.2000).

*Union Carbide Chemicals & Plastics Technology Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1187 (Fed.Cir.2002). The Federal Circuit Court of Appeals has also identified the specific factors relevant to a determination of invalidity based on "obviousness," as follows:

Obviousness is a legal conclusion based on underlying facts of four general types, all of which must be considered by the trier of fact: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Continental Can Co. USA, Inc. v. Monsanto Co.*, 948 F.2d 1264, 1270, 20 USPQ2d 1746, 1750–51 (Fed.Cir.1991); *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566–68, 1 USPQ2d 1593, 1594 (Fed.Cir.1987).

"Determination of obviousness cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention." *ATD Corp. v. Lydall, Inc.*, 159 F.3d 534, 546, 48 USPQ2d 1321, 1329 (Fed.Cir.1998). There must be a teaching or suggestion within the prior art, within the nature of the problem to be solved, or within the general knowledge of a person of ordinary skill in the field of the invention, to look to particular sources, to select particular elements, and to combine them as combined by the inventor. *See Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 665, 57 USPQ2d 1161, 1167 (Fed.Cir.2000); *ATD Corp.*, 159 F.3d at 546, 48 USPQ2d at 1329; *Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1072, 30 USPQ2d 1377, 1379 (Fed.Cir.1994) ("When the patented invention is made by combining known components to achieve a new system, the prior art must provide a sug-

gestion or motivation to make such a combination.").

*Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1375–76 (Fed.Cir. 2002).

While these principles are doubtless instructive in the context of obviousness-type double patenting, they may not transfer as directly to that context as Donaldson suggests. First, neither *In re Longi* nor *Eli Lilly*, the two authorities upon which Donaldson relies, would justify such a sweeping consideration of "obviousness in light of prior art" in the context of a challenge to the validity of a patent based on obviousness-type double patenting. The court's consideration of the impact of "prior art" in an obviousness-type double patenting challenge in *In re Longi* consisted of the following:

> The narrower question in the current case is whether, in the absence of a terminal disclaimer, the Board erred in affirming the examiner's determination that the claimed subject matter is merely an obvious modification of the invention claimed in the commonly-owned applications and the Mayr II patent, in light of the four prior art references. Of course, a double patenting rejection presupposes a patent. Thus, we start by examining the claims of the Mayr II patent, and by assessing the prior art references in order to ascertain whether the PTO made out a prima facie case of obviousness. Then we must look to the Albizzati declaration to determine whether the Board correctly concluded that this sole rebuttal evidence was insufficient to overcome the prima facie case. See In re Piasecki, 745 F.2d 1468, 223 USPQ 785 (Fed.Cir.1984).

> The basic concept underlying the claims in all the commonly-owned applications and patent is the formation of a highly active Ziegler-type catalyst by first combining a titanium compound with an activated form of magnesium halide. The particular species of titanium compound can be selected from titanium trihalides (Mayr I application), titanium oxyhalides (Galli application), or titanium tetrahalides (Mayr II patent). The difference between the claims in the instant application, on the one hand, and the Mayr II claims, on the other, is the recitation of the nitrogen-containing titanium compound in the present application. Thus, the question becomes whether the prior art discloses to one of ordinary skill in the art that magnesium halides in "active form" would have utility with the nitrogen-containing titanium compound embodied in the current invention.

> As taught by the four prior art references, all the claimed species of titanium compounds, as well as the nitrogen-containing titanium compounds of the claims now before us, are well-known "titanium compound" components of Ziegler-type catalysts. The compounds were correctly considered by the examiner to be qualitative equivalents. As the Board aptly noted, qualitative equivalence means that the active Ziegler-type catalysts could be prepared from these titanium compounds with the appropriate organometallic reducing agents (i.e., active magnesium chloride). More specifically, Nowlin and Argabright teach the use of such nitrogen-containing titanium compounds. Thus, with knowledge that an "activated magnesium halide" would increase the catalytic activity of a Ziegler-type catalyst prepared with the species of titanium compound claimed in the commonly-owned patent, it would have been obvious to one of ordinary skill in the art that the same effect would probably occur by using a nitrogen-containing titanium compound. Appellants retort that the various species of titanium com-

pounds are significantly different in structure from the nitrogen-containing titanium catalyst. But the prior art patents suggest that the Ziegler-type catalyst carrier (for example, magnesium halide) would have utility with each type of titanium compound. Thus, the fact that the nitrogen-containing compounds disclosed in Nowlins and Argabright might be different structurally would not deter one of ordinary skill in the art from combining the compound with the activated magnesium halide claimed in the commonly-owned Mayr II patent, for example. Accordingly, a prima facie case of obviousness-type double patenting was properly made.

*In re Longi,* 759 F.2d at 895–96 (footnote omitted) (emphasis added). The court then rejected an argument that "unexpected results" would defeat the *prima facie* showing of obviousness. *Id.* at 896–97.

As the cited discussion shows, the court's consideration of the import of the "prior art" in *In re Longi* "start[ed] by examining the claims of the [earlier] patent, and by assessing the prior art references in order to ascertain whether the PTO made out a prima facie case of obviousness" of the application claims *in light of the earlier patent and the prior art. Id.* at 895–96. *Consequently, the "prior art" was considered in the context of obviousness-type double patenting to determine whether it was a sort of bridge or connection between the **claims** of the earlier patent and the **claims** of the application, for one of ordinary skill in the art, to see if it demonstrated that the later application was **only an "obvious variation"** of the claims of the earlier patent. See Eli Lilly,* 251 F.3d at 969 (obviousness-type double patenting determines whether "[any] difference renders the claims patentably distinct"); *In re Goodman,* 11 F.3d at 1052 (because the claimed inventions were not identical in scope, the court was required to determine, at the second step of the analysis, whether the differences defined only an "obvious variation" or a "patentable distinction"). To put it another way, the prior art was used to determine whether the earlier and later patents "obviously" claimed the same thing. In the context of obviousness-type double patenting, the "prior art" was *not* considered as rendering the application claims "obvious" without regard to the earlier patent that purportedly established obviousness-type double patenting. *In re Longi,* 759 F.2d at 895–96 (emphasizing, instead, that "a double patenting rejection presupposes a[n] [earlier] patent"). Moreover, it appears that, in *In re Longi,* what the prior art "taught" was drawn primarily from what was *claimed* in the prior art patents, not just the structures present in embodiments of the invention. *Id.* at 896.

Specifically, in *In re Longi,* the question that the prior art answered was whether the application claimed only an obvious variation of the earlier patent—or "obviously" claimed the same thing as the earlier patent—where "[t]he basic concept underlying the claims in all the commonly-owned applications and patent [wa]s the formation of a highly active Ziegler-type catalyst by first combining a titanium compound with an activated form of magnesium halide," and "[t]he difference between the claims in the instant application, on the one hand, and the Mayr II claims, on the other, [wa]s the recitation of the nitrogen-containing titanium compound in the present application." *Id.* at 896. The prior art demonstrated the "obviousness" of the application over the patent, because, "[a]s taught by the four prior art references, all the claimed species of titanium compounds, as well as the nitrogen-containing titanium compounds of the claims now before [the court, were] well-known 'titanium compound' components of Ziegler-type catalysts," and, moreover, two of the prior art references taught "the use of such nitro-

gen-containing titanium compounds." *Id.* In short, the prior art at issue in *In re Longi* demonstrated obviousness-type double patenting by demonstrating that the application was *an obvious variation* of the existing patent, "obviously" claiming essentially the same thing.

While the *Eli Lilly* decision is not as thorough or specific in its discussion of the import of "prior art" in a case involving obviousness-type double patenting, the court in that case also relied on the prior art as teaching a bridge or connection between the earlier patent and the later patent. Specifically, the court concluded that, to persons of ordinary skill in the art, the prior art taught that pharmaceutically-acceptable salts of fluoxetine included fluoxetine hydrochloride, thus providing the bridge between the earlier patent, which was "directed to a method for treating anxiety in a human by administering an effective amount of fluoxetine or a pharmaceutically-acceptable salt thereof," and the later patent claim, which covered "a method of blocking the uptake of serotonin by brain neurons in animals by administering the compound fluoxetine hydrochloride." *Eli Lilly*, 251 F.3d at 968–69. Thus, as in *In re Longi*, the prior art at issue in *Eli Lilly* demonstrated that the later patent was *an obvious variation* of the later patent, or that it "obviously" claimed essentially the same thing, by demonstrating that the equivalence of "a pharmaceutically-acceptable salt of fluoxetine" and "fluoxetine hydrochloride," and the equivalence of "the treatment of anxiety in humans" and "the blocking of the uptake of serotonin by brain neurons in animals" with either compound.

In this case, Donaldson leaves out of its "prior art" analysis any attempt to demonstrate how the prior art that it identifies provides a bridge from the claims of the earlier '728 patent and the claims of the '456 patent, by demonstrating, for a person of ordinary skill in the art, that the '456 patent is only an "obvious variation" of, or "obviously" claims essentially the same thing, as the '728 patent. However, this relationship among an earlier patent, a later patent, *and* the prior art is precisely what is at issue in a case of obviousness-type double patenting, as distinguished from a direct "obviousness" challenge under 35 U.S.C. § 103. *See, e.g., In re Longi*, 759 F.2d at 895–96 ("Of course, *a double patenting rejection presupposes a patent*. Thus, we start by examining the claims of the Mayr II patent, and by assessing the prior art references in order to ascertain whether the PTO made out a prima facie case of obviousness.") (emphasis added).

■■■ Moreover, the court suggested above, and now holds, that Donaldson cannot make an invalidity challenge to the '456 patent based on "obviousness" in light of prior art pursuant to § 103, because Donaldson's representations during the *"Markman* hearing" must be construed as an abandonment of any of the invalidity defenses that Donaldson had *already pleaded* or had *identified in response to EPC's interrogatories* other than its invalidity defense based on the on-sale bar. Transcript, Markman Hearing and Hearing on Summary Judgment Motions, p. 98, *ll.* 10–22 (quoted in full *supra*, in Section I.B.3.) (counsel's representation that Donaldson was not asserting the invalidity of the '456 patent based on prior art, representing instead that its *only* "invalidity" defense to the '456 patent was that the invention had been marketed more than a year prior to the patent date). Prior to the *"Markman* hearing," in its original Answer and Counterclaim, Donaldson had *already pleaded* as one of its affirmative defenses that "Plaintiff's patent (U.S. Patent No. 4,445,456) ('the '456 patent') is invalid because it fails to satisfy the

requirements of patentability contained in 35 U.S.C. Section 101, *et seq.*, including, but not limited to, Sections 102(a), 102(b), and 103." *See* Donaldson's Answer and Counterclaim, ¶ 72. Thus, Donaldson had specifically pleading an "obviousness" ground for invalidity of the '456 patent. *See, e.g., Union Carbide Chemicals & Plastics Technology Corp.*, 308 F.3d at 1187 ("obviousness" is based on 35 U.S.C. § 103). Such an invalidity defense is repeated in Donaldson's First Amended Answer and Counterclaim, ¶ 71, as well as its Second Amended Answer and Counterclaim, ¶ 71, which was by stipulation of the parties, all prior to the "*Markman* hearing." Such a defense is consequently barred by Donaldson's representations during the "*Markman* hearing" that it had no "prior art" invalidity defense to the '456 patent. Although Donaldson has since been allowed to mount an "obviousness-type double patenting" challenge to the '456 patent, with the assertion that "prior art" is relevant to that inquiry, the court will not allow Donaldson to bring back into this litigation a fullscale "obviousness" challenge under § 103 by the "back door," via an "obviousness-type double patenting" challenge premised on "prior art," when its representations bar it from asserting any of the invalidity defenses it had already pleaded, other than the on-sale bar.

#### d. Merits of the "prior art" arguments

■ **i. The prior art in question.** The court turns to the merits of Donaldson's "prior art" argument. Again, Donaldson has identified as pertinent "prior art" here two patents to Richard Nelson. Those patents are United States Patent No. 3,939,457 (the '457 patent) and United States Patent No. 4,033,733 (the '733 patent). Copies of these two patents are attached to the Affidavit of James W. Miller as Exhibits A and B, respectively.

The '457 patent, which issued February 17, 1976, identifies Richard Donald Nelson as the inventor. The Abstract describes the invention as follows:

> An air filter restriction detection device communicating with the air stream passing from an air filter to the air intake of an internal combustion engine sensing a decrease in the supply of air being drawn through said air filter by said engine and the same being indicated by the linear movement of an indicating member in said device, said device indicating also when said air filter requires cleaning or replacement for lack of a sufficient supply of air being drawn therethrough.

The '457 patent, Abstract (Affidavit of James W. Miller, Exhibit A). The '733 patent, which issued July 5, 1977, also identifies Richard D. Nelson as the inventor, but identifies Joseph N. Nelson as the assignee. The Abstract of that patent describes the invention as follows:

> A gauge detecting the presence of a restriction placed upon an air stream passing through a filter in connection with an internal combustion engine, said gauge including a linear indicator to show the relative restriction present in the filter and including an indicator to show that the filter requires cleaning or replacement.

The '733 patent, Abstract (Affidavit of James W. Miller, Exhibit B). The abstracts of these patents indicate that, like the '456 patent and the '728 patent, these patents are part of the "same art" of air filter restriction indicators for air filters "in connection with an internal combustion engine." Nevertheless, EPC's contention that they were intended for "different performance requirements" may set them apart, where they were intended to indicate the air filter restriction *while the internal combustion engine was running,*

and both the '456 patent and the '728 patent allowed the operator to read the degree of restriction of the air filter without the necessity of running the engine.

To assist the further discussion of Donaldson's contention that these patents make the "guiding means" of claims 2 and 3 of the '456 patent obvious over the '728 patent in light of prior art, illustrations of the claimed invention from the '456 patent, the first embodiment of the '457 patent, and the '733 patent are shown below side-by-side, in both their infold and outfold positions:

THE '733 PATENT

THE '457 PATENT

THE '456 PATENT

In addition, the '457 patent illustrates and describes two other "modifications" relevant here, the "second modification" and the "third modification," which each show a different structure for the pertinent portion of the invention.[8] Those "modifications" are illustrated as follows:

### THE '457 PATENT

"SECOND MODIFICATION"

"THIRD MODIFICATION"

The side-by-side illustration of these purported "prior art" references with the '456 patent shows that, as with the '728 patent, there are similarities among them from a strictly layman's perspective. As pertinent to the immediate inquiry, both of the purported "prior art" references appear to show a more or less "cylindrical" or "tubular" member, which is attached to the movable portion of the diaphragm, "slidably disposed" within a "bore." In the case of the first embodiment of the '457 patent, the "member" appears to be a flat-headed bolt; in the "second modification," shown in Figure 8 from that patent, the member is what is described as "a cylindrical bolt like member 145," *see* the '457 patent, col. 4, *ll.* 50–51; and in the "third modification," shown in Figure 10 from that patent, the member is again described as "a cylindrical bolt-like member 195," *see id.*, col. 6, *ll.* 46–47. In the case of the '733 patent, the "member," as

illustrated, is more obviously "cylindrical." However, none of the "cylindrical members" in any of the illustrations appears to be "tubular" in the sense of "hollow," because no components of the invention appear to be disposed within the interior of the member.

However, the question, as framed above, is *not* what the illustrations show. It is, instead, does what is "taught" by these prior art references demonstrate that the '456 patent is only *an obvious variation* of the '728 patent?

***ii. Teachings of the '457 patent.*** As to the '457 patent, the only portion of claim 1 that relates to what appear to be potentially analogous structures and their functions are the following limitations:

> a cylindrical boss extending downwardly into said indicating member from the top wall of said housing,

and/or audible to the operator." The '457 patent, col. 4, *ll.* 26–31. However, it does not appear that any portion of this modification is relevant to the present discussion.

---

8. The "first" modification of the '457 patent "consists of the inclusion of an electrical circuit with said circuit embodying a signal located in such a place as to be readily visible

a guide member upstanding within and secured to said [flared cup shaped] indicating member freely moveable axially within said boss,

said housing being transparent to disclose said indicating member to show the progressive degree of restriction in said air filter and to indicate when said air filter requires replacement.

The '457 patent, claim 1, col. 8, *ll.* 7–12.

The court will consider what is "taught" by this reference, for purposes of Donaldson's obviousness-type double patenting challenge, first, in terms of what is expressly claimed. *See In re Longi,* 759 F.2d at 896 (for purposes of obviousness-type double patenting, considering what was taught by the prior art primarily in terms of what was *claimed* or suggested more generally by what was specifically claimed in that prior art, then comparing those teachings to the claims of both the earlier and later patents); *see also Eli Lilly,* 251 F.3d at 970–71 (same); *see generally Georgia–Pacific Corp.,* 195 F.3d at 1326 ("double patenting is a matter of what is *claimed* ") (emphasis added); *see also Crown Operations Int'l, Ltd.,* 289 F.3d at 1375 (whether prior art teaches the "obviousness" of a patent claim requires consideration, *inter alia,* of "(1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) any objective indicia of nonobviousness."). It appears that, in claim 1, the "upstanding" member is specifically claimed as a "guide member," of no particular shape, and that it is claimed to be "secured to said indicating member" and "freely moveable axially within said boss." However, there is no express claim that this structure is either a "means for guiding the indicating member as the diaphragm moves between its infold position and its outfold position," as in claim 2 of the '456 patent, nor any express claim that the "axial movement" of the "guide mem-

ber" "within said boss" is "closely slidable . . . as the diaphragm moves between its infold position and its outfold position," as in claim 3 of the '456 patent. Thus, the express language of claim 1 of the '457 patent seems to the court to fall well short of expressly teaching performance of a "guiding function" of guiding the indicating member as the diaphragm moves between its infold position and its outfold position through a "guiding means" consisting of the interaction of a cylindrical or tubular member closely slidably disposed within a bore or hub, as claimed in claims 2 and 3 of the '456 patent.

Nor, the court concludes, are the means-plus-function or specific structure of claims 2 and 3 of the '456 patent *inherently taught* by claim 1 of the '457 patent. To be inherently disclosed by a prior art reference, a limitation "must be necessarily present and a person of ordinary skill in the art would recognize its presence." *See, e.g., Crown Operations Int'l, Ltd. v. Solutia, Inc.,* 289 F.3d 1367, 1377 (Fed.Cir. 2002) (footnote omitted); *see also EMI Group North Am., Inc. v. Cypress Semiconductor Corp.,* 268 F.3d 1342, 1350 (Fed. Cir.2001) (anticipation and obviousness may depend upon what is inherently taught by prior art). Also, "[i]nherency 'may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.' " *Id.* (quoting *Continental Can Co. USA, Inc. v. Monsanto Co.,* 948 F.2d 1264, 1269 (Fed. Cir.1991)); *EMI Group North Am., Inc.,* 268 F.3d at 1350 (also citing *Continental Can,* 948 F.2d at 1268, for the proposition that, " '[t]o serve as an anticipation when the reference is silent about the asserted inherent characteristic, such gap in the reference may be filled with recourse to extrinsic evidence,' " and that " '[s]uch evidence must make clear that the missing descriptive matter is necessarily present in

the thing described in the reference, and that it would be so recognized by persons of ordinary skill,'" and observing, further, that the requirement that a person of ordinary skill in the art must recognize that the missing descriptive matter is necessarily present in the reference "may be sensible for claims that recite limitations of structure, compositions of matter, and method steps which could be inherently found in the prior art"). Although Donaldson has identified similarities between the structures in claim 1 of the '457 patent, on the one hand, and claims 2 and 3 of the '456 patent, on the other, Donaldson makes only conclusory assertions that the "guiding means" and "guiding function" are inherent in the claimed structures, because it is "ludicrous" to assume that one skilled in the art would not recognize the inherent guiding function of these structures. While it is possible, even probable, that the claimed structures would perform some "guiding function," they do not necessarily do so, nor would a person of ordinary skill in the art necessarily have recognized that they would do so. *Id.* Indeed, EPC is armed with the countervailing presumption of the correctness of the PTO's determination that claims 2 and 3 of the '456 patent are patentable over the prior art, including the '457 patent. Furthermore, even "obviousness" under § 103 " 'cannot be based on the hindsight combination of components selectively culled from the prior art to fit the parameters of the patented invention,' " *Crown Operations Int'l, Ltd.*, 289 F.3d at 1376 (quoting *ATD Corp.*, 159 F.3d at 546), and Donald-son appears to have done little else in its assertion that structures *not claimed* in the "prior art" perform functions *not claimed* in the "prior art." Moreover, the court finds that EPC has pointed out a that a significantly different problem had to be solved in "progressive" air filter restriction indicators, like the '456 patent and the '728 patent, as opposed to the "prior art" references upon which Donaldson relies: The indicator had to remain stable and in position, so that it could be "locked" in position, and could continue to display the level of restriction, even when the engine was no longer running. *See id.* (noting that there must be a teaching or suggestion within the prior art, or within the nature of the problem to be solved, to look to particular sources and select particular elements, and to combine them).[9] Thus, this "prior art" does not suggest a solution to the problem presented and overcome by the '456 patent and the '728 patent.

The same flaws plague Donaldson's argument with regard to claim 2 of the '457 patent. The pertinent portion of claim 2 is the following:

> a cylindrical boss depending from the top wall of said housing into said indicating member, said boss having an open bottom chamber axially thereof,
>
> a cylindrical member upstanding from the end wall of said diaphragm moveably axially within said chamber,

---

9. Donaldson argues that EPC's contentions regarding the significance of the guiding means in a "progressive" or "locking" air filter restriction indicator is a "red herring," because only the "guiding means" and not the "locking" mechanism distinguishes the '456 patent from the '728 patent. However, it is Donaldson's argument that the court finds to be a "red herring," because it again fails to address the essence of the impact of prior art in the context of analysis of obviousness-type double patenting: The question is whether the '456 patent is only *an obvious variation* of the '728 patent, where *both* are "progressive" air filter restriction indicators with "locking" means. If the prior art teaches nothing or suggests nothing applicable to "progressive" air filter restriction indicators, it cannot provide the "bridge" between the earlier and later patents at issue here.

a transverse slot within said cylindrical member adjacent the upper portion thereof,

a spring loaded ball in said slot,

a pair of terminals carried by said boss adjacent the bottom thereof, said terminals having spaced adjacent end portions,

said terminals having portions extending outwardly of said housing in circuit with a signal circuit,

an aperture in said boss adjacent said terminals, said aperture being of such size as to permit said ball to extend there through sufficiently to engage said adjacent end portions of said terminals, and

said diaphragm under sufficient partial vacuum drawn thereon by said air stream under restriction in said air filter moving said cylindrical member downwardly sufficiently for said ball to be in alignment with and extend through said aperture in said boss to open a signal circuit by engaging said adjacent terminals.

*Id.*, claim 2, col. 8, *ll.* 37–42. Claim 2 is absolutely silent on any identification of the "cylindrical member" as a "guide," a "guiding means," or as performing any "guiding" function for the indicating member, alone or in interaction with the "cylindrical boss" or any other structure, as the diaphragm moves between its infold and outfold positions. Indeed, if the "cylindrical member" "guides" at all, *as claimed,* its purpose is to "guide" the "ball" to the "aperture in said boss" to allow a circuit to close, indicating restriction of the air filter. Nor are any "guiding means" or "guiding function" for the indicating member, as the diaphragm moves between its infold and outfold positions, inherent in the claimed structures, even if it is possible, or even probable, that they would perform that function, because they would not necessarily do so, nor would a person of ordinary

skill in the art have necessarily recognized that they would. *See Crown Operations Int'l, Ltd.*, 289 F.3d at 1377 (probabilities and possibilities are not enough to show "obviousness"). This "prior art" does not suggest solutions for the problems of guiding the indicating member as the diaphragm moves between its infold and outfold positions in a "progressive" air filter restriction indicator employing "locking" mechanism.

More importantly, in the context of obviousness-type double patenting, Donaldson has failed to demonstrate in what way the claims of the '457 patent provide any sort of bridge or connection between the claims of the earlier '728 patent and the claims of the later '456 patent to demonstrate that the later patent is only *an obvious variant* of the earlier patent. *See, e.g., In re Longi,* 759 F.2d at 895–96 ("Of course, *a double patenting rejection presupposes a patent.* Thus, we start by examining the claims of the Mayr II patent, and by assessing the prior art references in order to ascertain whether the PTO made out a prima facie case of obviousness.") (emphasis added). Because neither claim 1 nor claim 2 of the '457 patent expressly or inherently teaches a "guiding means" in terms of either a means-plus-function or specific structure, as in claims 2 and 3 of the '456 patent, or demonstrates that structures expressly claimed in the '728 patent "obviously" perform the guiding function of the means and structures claimed in claims 2 and 3 of the '456 patent, there is nothing about combining the teachings of the '457 patent with the claims of the '728 patent that would "bridge the gap" between the '728 patent and the '456 patent to demonstrate that the '456 patent was only *an obvious variation* of the invention already claimed in the '728 patent.

***iii. Teachings of the '733 patent.***
The illustrations accompanying the '733

patent show a more or less "cylindrical" member, which is attached to the movable portion of the diaphragm, "slidably disposed" within a "bore." However, the claims of the patent are absolutely devoid of any reference to either the "cylindrical" member or the "bore," which this court concluded, in its construction of claims 2 and 3 of the '456 patent, interact to perform the "guiding function." Instead, claim 1 of the '733 patent claims the diaphragm and "cup shaped indicating member" disposed within a housing, and the structures indicating the restriction of the air filter; claim 2 claims structure of the indicating member to make the diaphragm "very sensitive to samll [sic] increments of change in the vacuum drawn on the chamber thereabove caused by restrictions in said air filter"; and claim 3 claims addition of an electrical circuit to indicate a full restriction of the air filter. *See* the '733 patent, claims 1–3. Totally absent from any of the claims of the '733 patent is any reference to what is described in the Preferred Embodiment as "a central tubular hub portion 90 depending [from the end wall 27] into said chamber 28 and ha[ving] a bore 81 therein"; a "cylindrical guide member 85" that is "[s]lideably disposed into said bore 81"; or "[s]aid guide member [that] is of such length as not to be fully withdrawn from within said bore 81 when said diaphragm is folded in upon itself as indicated in FIG. 4." *See* The '733 patent, Preferred Embodiment, col. 3, *ll.* 5–16. Thus, not only is no means-plus-function claim or claim for a specific structure performing any "guiding function" present in the '733 patent, such that the patent claims might require recourse to the written description of the embodiment to identify pertinent structures, and thus expressly teach the "guiding means" of claims 2 and 3 of the '456 patent, but it is not possible for any such "guiding function" to be inherently taught by the structures claimed in the '733 pat-

ent. Consequently, the '733 patent also fails to provide any sort of bridge for a person of ordinary skill in the art between what is claimed in the '728 patent and what is claimed in the '456 patent such that the later patent would be only *an obvious variation* of the earlier patent.

### 6. Summary of step two

The court concludes that claim 1 of the '728 patent does not claim any "guiding means," either in means-plus-function form or in terms of specific structures, that performs the "guiding function" of guiding the indicating member as the diaphragm moves between its infold and outfold positions. The court concludes, further, that neither of the "prior art" patents upon which Donaldson relies demonstrates that the '456 patent should be invalidated for obviousness-type double patenting over the '728 patent. This is so, because neither the '457 patent nor the '733 patent *claims,* either expressly or inherently, in either means-plus-function form or in the form of specific structure, any "guiding means" consisting of the interaction of a cylindrical or tubular member closely slidably disposed within a bore or hub, as claimed in claims 2 and 3 of the '456 patent, to perform the "guiding function" specified in the '456 patent. Moreover, the prior art upon which Donaldson relies simply does not provide any bridge or connection between the claims of the '728 patent and the '456 patent such that the prior art demonstrates that the '456 patent is only *an obvious variation* of the invention claimed in the '728 patent. Donaldson has, therefore, failed to prove as a matter of law that claims 2 and 3 of the '456 patent are separately invalid for obviousness-type double patenting over the '728 patent, or that the "composite invention" of claims 1, 2, and 3 of the '456 patent is invalid for obviousness-type double patenting over claim 1 of the '728 patent. Donaldson's motion asserting the invalidity of the '456

patent for obviousness-type double patenting will, therefore, be denied.

## III. EPC'S MOTION TO REASSERT THE '728 PATENT

EPC filed its own Motion To Reassert The '728 Patent "in partial response to" Donaldson's Motion for Summary Judgment Based on New Federal Circuit Case Law Re: Double Patenting. Because the court concluded above, after extensive analysis, that the '456 patent is not invalid, and Donaldson's summary judgment motion must be denied, the court concludes that EPC's Motion To Reassert The '728 Patent is now moot. In the alternative, the court concludes that EPC's Motion To Reassert The '728 Patent should be denied on the merits for essentially the reasons set forth in Donaldson's brief on that motion and this court's ruling in *MidAmerican Energy Co. v. Great Am. Ins. Co.*, 171 F.Supp.2d 835 (N.D.Iowa 2001). Somewhat more specifically, reassertion of the '728 patent would not require rescinding any judgment, but undoing a valid stipulation of the parties, and no adequate circumstances for undoing that stipulation have been asserted by EPC.

## IV. CONCLUSION

The long and arduous consideration of the parties' motions leads ultimately to the following conclusions. Consideration of Donaldson's Motion for Summary Judgment Based on New Federal Circuit Case Law Re: Double Patenting is not barred on timeliness grounds, nor by the stipulation of the parties or representations by Donaldson's counsel during the *"Markman* hearing" before Judge Melloy. The court is not convinced that the *Eli Lilly* decision upon which Donaldson relies is, in any significant respect, "new" authority. Nevertheless, considering Donaldson's motion for summary judgment on the merits, in light of *Eli Lilly* and other authorities, the court concludes that Donaldson has failed to establish as a matter of law that the '456 patent is invalid for obviousness-type double patenting over the '728 patent. This is so, even under the "one-way test," which the court concludes is applicable here, and even in light of "prior art," when that "prior art" is properly considered in the context of obviousness-type double patenting. That conclusion renders EPC's Motion To Reassert The '728 Patent moot, but even if it did not, this court would also deny EPC's motion on the merits.

THEREFORE,

1. Donaldson's December 21, 2001, Motion for Summary Judgment Based on New Federal Circuit Case Law Re: Double Patenting is **denied.**

2. EPC's January 23, 2002, Motion To Reassert The '728 Patent is also **denied.**

**IT IS SO ORDERED.**